## COMMONWEALTH vs. LEWIS FRANKLIN.

Plymouth. March 8, 2013. - July 16, 2013.

Present: IRELAND, C.J., CORDY, GANTS, DUFFLY, & LENK, JJ.

*Homicide. Evidence,* Hearsay, State of mind, Threat, Identification. *Threatening. Identification. Practice, Criminal,* Capital case, Assistance of counsel, Request for jury instructions, Argument by prosecutor, New trial.

At a murder trial, the judge did not err in admitting the testimony of certain witnesses concerning threats that the victim made regarding the defendant, where abundant evidence existed to allow a jury to infer that the defendant learned of these threats and that they were a motive in the killing. [906-908]

At a murder trial, no substantial likelihood of a miscarriage of justice arose from the lack of a specific instruction on eyewitness identification, including an instruction on good faith error in identification, and therefore, defense counsel's failure to request such an instruction and to object to the absence of such an instruction did not constitute ineffective assistance of counsel, where such an instruction would likely not have influenced the jury's conclusion, in light of other instructions provided to the jury to guide their analysis of the reliability of the testimony of each witness, the uncertainty in each eyewitness's testimony, and the overwhelming amount of evidence against the defendant that did not turn on the identification testimony. [908-914]

At a criminal trial, although the prosecutor, in closing argument, misstated the evidence in one statement, the error was inconsequential; further, no error arose in another assertion by the prosecutor; finally, the prosecutor did not create a substantial likelihood of a miscarriage of justice when he agreed with the judge at the charge conference that no instruction on the defendant's consciousness of guilt was necessary and then argued evidence that suggested the defendant's consciousness of guilt. [914-916]

This court declined to exercise its authority under G. L. c. 278, § 33E, to order a new trial of an indictment charging the defendant with murder in the first degree or to reduce the severity of the verdict, where, although the Commonwealth did not eliminate the theoretical possibility that an unidentified third party shot the victim while the defendant and the victim were in the midst of an angry dispute, the great weight of the evidence established that the defendant was the shooter. [916-918]

INDICTMENTS found and returned in the Superior Court Department on December 7, 2007.

The cases were tried before *Paul E. Troy,* J.

*Robert F. Shaw, Jr.*, for the defendant.

*Robert C. Thompson*, Assistant District Attorney, for the Commonwealth.

GANTS, J. A Superior Court jury convicted the defendant of murder in the first degree on a theory of deliberate premeditation, in violation of G. L. c. 265, § 1, for the killing of John Falcone.[1] The defendant raises four issues on appeal. First, he argues that the judge erred in permitting statements of the victim to be introduced in evidence for the purpose of establishing the defendant's motive to kill where the evidence failed to show that the defendant knew of these statements. Second, he contends that his attorney's failure to request that the jury be specifically instructed on issues relating to eyewitness identification constituted ineffective assistance of counsel. Third, the defendant claims that the prosecutor made various improper and prejudicial statements in his closing argument. Fourth, he argues that this court should exercise its authority under G. L. c. 278, § 33E, and order a new trial because the weight of the evidence does not support the verdict, or else reduce his conviction to either murder in the second degree or manslaughter. For the reasons detailed below, we affirm the convictions and, after a complete review of the record, decline to exercise our authority under G. L. c. 278, § 33E, to order a new trial or to reduce the murder conviction to a lesser degree of guilt.

*Background.* The defendant does not challenge the legal sufficiency of the evidence at trial, but he does contend that the "verdict was against . . . the weight of the evidence," G. L. c. 278, § 33E, so we summarize the relevant evidence rather than present the evidence in the light most favorable to the prosecution.

1. *Before the shooting.* In the early morning of August 23, 2004, the victim, a thirty year old white male, along with Anthony Robinson and Mary Beth Hagopian, decided to purchase a "twenty rock" of "crack" cocaine. Although a "twenty

---

[1]The defendant also was convicted of unlawful carrying of a firearm, in violation of G. L. c. 269, § 10 (*a*). He was sentenced to life in prison without the possibility of parole on the murder conviction, and to no less than two years and no more than four years in State prison on the firearm conviction, to be served concurrently with his life sentence.

rock" would generally cost twenty dollars, they were able to pool together only fourteen dollars, most of which was contributed by the victim. At 8:08 A.M., according to cellular telephone records, Robinson telephoned the defendant, whom Robinson knew as "G," and asked to purchase the crack cocaine, telling him he was "short" the full price. The defendant told Robinson to give him a few minutes and meet him in front of a pizza restaurant that was across the street from a gasoline station on North Main Street in Brockton. Approximately ten minutes later, the defendant arrived at the parking lot in front of the restaurant on foot.

Robinson gave him the fourteen dollars, and the defendant placed an item on the ground that Robinson believed to be crack cocaine. Robinson retrieved the item from the ground, and he, Hagopian, and the victim drove to a park to smoke it with a pipe.[2] The victim smoked it first and immediately became "very upset" and said, "[I]t's not real." Robinson then smoked it and agreed that the substance was not crack cocaine.

Robinson attempted to telephone the defendant, but the defendant did not answer despite approximately ten to twelve attempts. The defendant answered only when Robinson called him from a different telephone. Robinson explained what had happened, and the defendant said he would "make it right." At this point, the victim grabbed the telephone from Robinson and began "cursing" and "threatening" the defendant, telling him, "You don't want to fuck me over. You don't know who I am." Robinson, Hagopian, and the victim then returned to the parking lot in front of the pizza restaurant, and waited "[a] half hour, maybe more" for the defendant to arrive and provide them with real crack cocaine. The defendant never arrived. While they were waiting, the victim "got more upset, more angry," and started accusing Robinson of "screw[ing] him." Their argument became so loud that the police arrived, told Hagopian to go home, and separated Robinson and the victim.[3] The police asked Robinson

---

[2]Anthony Robinson testified that the defendant was wearing "[b]lack jeans," "a jersey of some sort that had black and green in it," and a "baseball-style hat" with "the same colors" and "[m]aybe a little white." On cross-examination, he agreed that the defendant's shirt "was white with green and some black."

[3]One of the police officers pat frisked the victim, but "[n]othing was found on him."

to go north and the victim to go south on North Main Street, and they both complied.

At approximately 9:30 A.M., Troy Edmondson was behind an abandoned building on North Main Street between Farrington Street and Prospect Street when he saw the victim, whom he had known for about one week. The victim appeared "pretty mad" and told him that "he had got ripped off," that "somebody beat [him] for fourteen dollars," and that "some guy named G" "sold him soap." Edmondson told the victim that "G" lived on Prospect Street, but he did not know where. The victim then walked off in the direction of Prospect Street.

Kirsha Hilliard was living on the third floor of 28 Prospect Street, a "triple decker" house owned by her parents, who lived on the second floor; Wanda Franklin, the defendant's mother, lived on the first floor. At approximately 9:45 A.M., Kirsha[4] was walking toward her house when she noticed the victim walking "pretty quickly" behind her. After he passed her, she saw him stand right in front of 28 Prospect Street. "He was just pacing, like, kind of back and forth, looking around. . . . He just had this look like he was mad at something." Kirsha asked the victim why he was standing in front of her house, and he told her that "he was looking for G," and "[h]e said that he wanted his money back." When she asked him what the money was for, "he told [her] that [the defendant] had beat him for some drugs." Kirsha testified that the victim "threatened to destroy my mom's property" by "[a]ny way possible: throwing rocks, whatever he had to do." In response, Kirsha "told him that he wasn't going to do that, and that [the defendant] didn't live there." The victim "calmed down" and asked where he could find the defendant. Kirsha told him to go next door, and he did so. After he was "shooed" away by Kirsha's neighbors, she saw him walk "down towards Main Street."

Immediately after her conversation with the victim, Kirsha went inside 28 Prospect Street and spoke with Wanda.[5] Kirsha

---

[4]We refer to Kirsha Hilliard by her first name to avoid confusion with her children, Josiah Bell-Hilliard and Imani Bell-Hilliard, who also testified as witnesses.

[5]We refer to Wanda Franklin by her first name to avoid confusion with her son, Lewis Franklin, the defendant.

testified that she told Wanda that "this guy came up and was looking for [the defendant] and he wanted his money. And he said that he had just beat him for drugs." She also told Wanda "that he said he was going to destroy the house, throwing rocks, 'cause he needed to get his money."

According to Wanda's testimony, "[Kirsha] said that [the defendant] had allegedly sold this white gentleman some fake crack and I had to stop him from throwing rocks at . . . the windows. And I told her . . . I'll handle that." Wanda "went straight to the kitchen" to find her son, where he was sitting with headphones on. Wanda "plucked the earphones [he was wearing] to get his attention." Wanda asked the defendant, "What are you doing outside?" The defendant responded, "What do you mean, Ma?" Wanda then gave her son "a look" indicating that she was "not happy," and she went to get ready to go to work. Wanda testified that at no point during her conversation with the defendant did she mention any specific information she had obtained from Kirsha.[6]

Moments later, the defendant walked past Kirsha on the front porch and headed down Prospect Street toward Main Street.[7] At 10:07 a.m., according to cellular telephone records, the defendant telephoned Robinson. Robinson testified that the defendant "was pretty much yelling," and asked, "Where's that white boy you were with? Where the fuck's that white boy." Robinson then told the defendant that the victim was "probably down by" the gasoline station on North Main Street that was across the street from the pizza restaurant where the defendant had provided the fake "crack" cocaine. Robinson asked the defend-

---

[6]Wanda testified before a grand jury that, when she saw the defendant on the morning of August 23, 2004, he was wearing blue jeans, a white T-shirt, and a baseball cap. She testified at trial that she had never seen him with a shirt that was black, multicolored, or black and green and white. She testified that she did not see or hear from the defendant after this encounter until after her grand jury testimony on September 10, 2004, but she stated that this was not unusual.

[7]Kirsha Hilliard testified that, when the defendant walked by her, he was wearing a "funny . . . colored" cotton T-shirt that was "green, yellow, red, [and] black" and reminded her of "a Jamaican flag," a baseball cap (the details of which she could not remember), and "[d]ark colored" pants.

ant what happened with "that thing that we did earlier," and the defendant told Robinson to "lose [his] number."[8]

Meanwhile, the victim returned to where Edmondson was sitting behind the abandoned building on North Main Street,[9] and told Edmondson that he had knocked on the door of the defendant's house "and said if he didn't get his money back, he was going to throw a brick through the window." While they were talking, the defendant walked over to them and loudly asked the victim, "Who the fuck came by my house?" Between the victim and the defendant "a few words were said back and forth," and this argument lasted for about "two or three minutes." The argument ended when the defendant said something like "you don't want none of this, or you don't want to fuck with this," and then "walked around the corner" on North Main Street toward Prospect Street. After four or five minutes, the victim was "[s]till pretty mad," and Edmondson observed him walk off in the same direction as the defendant.[10,11]

Edmondson testified that, approximately five minutes after the victim departed, he saw the defendant and the victim from "the shoulders up," behind a large mound of dirt that partially

---

[8]The records from Robinson's cellular telephone indicate that the last communications with the defendant's cellular telephone were an outgoing call to the defendant at 10:02 A.M. and an incoming call from the defendant at 10:07 A.M. Although Robinson testified that he thought he had initiated this telephone call, it is more likely in view of the telephone records and the content of this call that the defendant initiated it.

[9]On direct examination, Troy Edmondson testified that, at this point in time, there was no one else present with him and the victim behind the abandoned building. During defense counsel's closing argument, he attacked Edmondson's credibility by suggesting that this was inconsistent with the testimony of a police officer who had stated that he saw four to six people, including Edmondson, in that general vicinity five to fifteen minutes before he received a radio call about the shooting.

[10]Edmondson testified that he knew the defendant "from the neighborhood," and that before the date in question, he would see the defendant around the neighborhood "[o]nce in a while."

[11]Edmondson testified that the defendant was wearing "[b]lack jeans with a black shirt and black" baseball-type hat with "a sports logo on it." On cross-examination, he admitted that there could have been other colors on the defendant's shirt, but he was sure that there "was black in there," and his memory was that the shirt was black. Regarding the defendant's pants, Edmondson was asked whether they could have been blue jeans, and he responded, "No. He was in all black."

obstructed his view, running in a yard from Prospect Street toward Farrington Street. However, he could not remember who was running in front or behind. The next thing he heard was gunshots.[12]

2. *The shooting.* At 10:18 A.M. on the date in question, Officer Mark Noone of the Brockton school police department received a dispatch for shots fired on Farrington Street. On his arrival, he was pointed to the backyard of 24 Farrington Street, which adjoins some backyards on Prospect Street, where he discovered the victim lying on his back on top of a bicycle. The victim was still alive, but soon died from his wounds. The medical examiner opined that the cause of the victim's death was a single gunshot wound in which a projectile entered through the victim's back and exited through his chest, traveling in an upward trajectory through the victim's body.[13] The Commonwealth's ballistics expert testified that five discharged nine millimeter cartridge casings were recovered from the area on or near a black automobile parked on the street in front of 18 Farrington Street. He opined that all five shots were fired from the same semi-automatic weapon from that general area. He also testified that he observed five holes in the siding of 24 Farrington Street, four of which were consistent with gunshot damage, and that the angle of these holes was consistent with someone shooting from the area where the spent cartridge casings were recovered.

The testimony at trial from civilian witnesses to the events immediately leading up to and following the shooting was convoluted, and several of the details appear to contradict each other. Nina Hall, who lived on the first floor of 24 Farrington Street, testified that she was talking on the telephone when she heard three voices, two male and one female, but she was unsure

---

[12]When questioned by a detective in 2004, Edmondson did not mention that he saw either the defendant or the victim chasing the other, and when he testified before a grand jury, he said he only "caught a glimpse" of the defendant running.

[13]The medical examiner testified that the victim's body had a recorded height of five feet, nine inches. Gary Mercurio, an officer of the Brockton police department, testified that, as of March, 2004, the defendant was "pretty tall," "around six-two or six-three." During defense counsel's closing argument, he suggested that it would be unlikely for a person who was six feet, three inches tall to shoot a man who was five feet, nine inches tall at an upward angle.

whether the female voice came from the telephone or from outside her house. The persons outside were "speaking loudly," and she heard one of the men say, "You came to my house being disrespectful," and then heard someone say "something about fifteen dollars and then it was shots fired." She did not see the shooting itself.

Robert Fuqua was fourteen years old at the time of the shooting, and he lived at 18 Farrington Street on the second floor with his older brother, Willie. Robert's bedroom was on the side of the house closest to the driveway of 24 Farrington Street, near where the victim was found. Robert testified that, at approximately 10:15 A.M., he heard two men arguing behind the rear porch of 24 Farrington Street. He heard one man say "[W]here's my money," and when he looked out his bedroom window, he saw a man with "[l]ight brown" skin,[14] "wearing a black hat, a black coat, and blue jean shorts," who he recalled at trial to be approximately six feet, two inches tall.[15] Approximately ten minutes later, he heard gunshots coming from "right next to 24 Farrington." About one minute after he heard the gunshots, he looked out the window and saw the same man described above, who was bent over and moving his arms around. Robert could not identify what was on the ground beneath the man. Robert then saw the man run towards the back fence, "towards Prospect Street," holding a black handgun.

After the first man ran away, Robert saw a second man come up and "look[] over to where the body was laying. And he took off in the same direction as the [first] man." Robert testified that he believed this second man was shorter than the first man, and that he was "wearing a red shirt and blue jeans."

Willie Fuqua, Robert's older brother, was about sixteen years old at the time of the shooting, and he lived with his brother on the second floor of 18 Farrington Street. Willie testified that, on that particular morning, his attention was· drawn to the back of the house, where he saw through a window that two men were arguing in the backyard of 24 Farrington Street. Willie described

---

[14]The defendant is African-American.

[15]On cross-examination, Robert Fuqua admitted that the statement he gave to the police in August, 2004, indicated that he had told the police this man was approximately five feet, ten to eleven inches tall.

one of the men as "black, almost Hispanic-looking," and wearing a black hat, a black jacket, and blue jean shorts. He recalled this man saying that he wanted $1,000, something about the other man taking his girl, and something about five more dollars. He later heard this man say, "You'll see what I can do." "[A]fter a few" minutes, he heard four to five gunshots.[16]

Erika Luyo was the only eyewitness who actually saw the shooting. At about 10:15 A.M. on the day of the shooting, she was putting some dishes in the sink at 16 Farrington Street when she got a "quick glimpse" through her kitchen window of a young "[b]lack" man walking up Farrington Street from the direction of North Main Street. A few seconds later, as she opened the door to her enclosed porch to go shopping, she heard gunshots. She looked outside through a window, and she saw the same African-American man standing about twenty to twenty-five yards away, near the driveway of 18 Farrington Street, wearing black gloves, black pants, and "a black outer something." He was holding a gun with both hands, firing it in a direction away from 16 Farrington Street, toward the houses further down Farrington Street. After the shooting, she saw the shooter run up the driveway between 18 and 24 Farrington Street, towards Prospect Street.

Later, Luyo met with police officers, including State Trooper Ruben Colon, who showed her a photographic array and "informed her . . . that the suspect may or may not [have been] in the photos [the officers] presented to her." According to Trooper Colon's testimony, Luyo stated that the shooter "looked like No. 2 but he had hair like No. 4." The individual in photograph number 2 was the defendant; the individual in photograph number 4 had tighter braids than the defendant's as depicted in photograph number 2. Luyo explicitly said in her testimony, during both direct and cross-examination, that she told the officers that she "was not sure" about her identification of the defendant from the photographic array.

---

[16]Unlike his brother, Willie Fuqua testified that he thought the argument took place between 7:30 and 8 A.M., and that the shooting took place significantly later at approximately 10 A.M. However, his testimony was contradictory in that he also stated that, when the argument had concluded, he heard the gunshots "after a few" minutes.

3. *After the shooting.* Josiah Bell-Hilliard, the son of Kirsha Hilliard, was about thirteen or fourteen years old at the time of the shooting, and he lived at 28 Prospect Street on the third floor with his younger sister, Imani, who was about ten or eleven years old. That morning, Josiah and Imani were painting a bedroom when Josiah heard a fence moving in the yard outside the house's rear window. At trial, Josiah agreed that the transcript from his grand jury testimony reflected that he told the grand jury that, when he looked outside, he "saw Lewis hopping over the fence," and that he recognized the defendant at that time. He further testified at trial that he had known the defendant for years, and that "back then, we called him G." Josiah's grand jury testimony reflected that he asked the defendant where he was going, but the defendant "didn't respond"; instead, he "put his hands up and just looked sideways" and then "he just kept on running."[17,18]

Imani testified that, on the date of the shooting, she heard approximately five gunshots, and then two to three minutes later, she heard the backyard fence rattle. She, too, saw the defendant jump over the backyard fence, and put his hand up and continue "jogging" after she or her brother asked where he was going.[19]

Daniel Sweeting, a retired firefighter, lived at 50 Prospect Street on the day of the shooting. He testified that, when the gunshots were fired, he was in his basement, but he immediately ran upstairs and was outside looking down Prospect Street toward where he thought the shots were fired within "[p]robably half a minute." At this point, he saw a black male walking from between the houses on the north side of Prospect Street, from the direction of Farrington Street. The man was "looking back . . .

---

[17]The backyard of 28 Prospect Street was on the south side of the street, the side furthest from Farrington Street, and it did not adjoin the backyard of any house on Farrington Street. Josiah Bell-Hilliard stated that after the defendant jumped over the fence behind his house, he saw the defendant run west on Waverly Street (which is south of Prospect Street) and then south on Falmouth Avenue.

[18]Josiah admitted at trial that the grand jury transcript reflected that he had previously testified that the defendant "had a green hat on with short braids," and wore "a type of Jamaican shirt that had green, yellow, red on it," and light blue "regular jeans."

[19]Imani Bell-Hilliard testified that the defendant was wearing a Celtics hat and a tannish colored jersey shirt, white sneakers, and jeans.

[o]ver his left shoulder," and he was wearing "dark clothing," consisting of a "dark" baseball cap and a "dark" short sleeved shirt. On cross-examination, Sweeting admitted that he told the police on the day after the shooting that the person he saw appeared to be about five feet, eight inches tall.

Adam Thayer, who was about twenty-five or twenty-six years old at the time of the shooting, lived at 17 Prospect Street, where his backyard bordered the backyards of several houses on Farrington Street, including 24 Farrington Street to the left. Because there were two large holes in the fence that separated his backyard from the Farrington Street backyards, one on the left and one on the right, he saw people crossing through his yard "[e]very day" as a shortcut to get from Prospect Street to Farrington Street. Thayer testified that, at about 10:15 A.M. on the morning of the shooting, he saw an African-American "kid" wearing a white hat cut through his yard and cross through the left side of the fence. After the "kid" crossed through the hole in the fence, Thayer heard the gunshots and saw the "kid" immediately running back through his yard, heading in the direction of North Main Street. Thayer estimated that the "kid" had gone into the hole in the fence and come back in a matter of five to ten seconds.[20]

4. *The confession.* Carlos Hill, the defendant's cousin, first testified before a grand jury on October 1, 2004, and testified before a second grand jury in October, 2007, after having been "picked up on charges."[21] Before the second grand jury, Hill testified that the defendant told him in the fall of 2004 that he had gone to Florida after the victim died "because of the shooting." Hill told the grand jury that the defendant told him that "he had played the dude for rum and the dude realized it,

---

[20]During his closing argument, the prosecutor argued that the person wearing the white hat was not the shooter, but simply a passerby who happened to walk into the scene of a shooting, and who fled when he realized what had happened. He argued that it "would have been humanly impossible" for this person to have gone from the hole in the fence to the location where the shell casings were recovered and then back out the hole in the fence in a matter of seconds.

[21]Carlos Hill did not testify at trial as to what he said in his 2004 grand jury testimony, and the minutes of that testimony were not read to Hill as a witness at the trial. No evidence was offered that Hill received any promises, rewards, or inducements in return for any of his grand jury or trial testimony.

and . . . the dude told him he was going to throw rocks at my aunt's house,[22] and I guess they bumped heads again on Farrington [Street]." Hill testified before the second grand jury that the defendant told him that he went to go get a gun, that the altercation between the defendant and the victim "got heated up," and the defendant shot the victim four times.

However, at trial, Hill repeatedly testified that he did not remember making any of the statements read to him from the minutes of his 2007 grand jury testimony, and that his entire 2007 testimony was incorrect. At trial, Hill testified that all the defendant had said to him in the fall of 2004 was that he had gone to Florida "because he was on the run for probation. He owed them a fine or whatever," and that he had returned to Massachusetts "to pay off the fine." Hill explained that in 2007 he "smoked a lot of crack," and that his grand jury testimony at that time was based on a mistaken but honest belief that the defendant had actually confessed to the shooting. He claimed at trial that he did not learn anything about the shooting from the defendant, but instead learned it from others, including a coworker. He also testified that, apart from the allegations by the Commonwealth, he had never heard that the defendant was involved in the shooting, but he simply heard "that someone shot someone four times in the chest."

The relevant portions of Hill's sworn description of the defendant's confession before the 2007 grand jury were properly admitted as substantive evidence of the defendant's guilt because they were inconsistent with his testimony at trial, the defendant had an adequate opportunity to cross-examine Hill at trial, and Hill's prior grand jury testimony was in his own words and was not coerced. See *Commonwealth* v. *Daye*, 393 Mass. 55, 72-75 (1984), as modified by *Commonwealth* v. *Cong Duc Le*, 444 Mass. 431, 432 n.3 (2005); Mass. G. Evid. § 801(d)(1)(A) & note (2013).

*Discussion.* 1. *Evidence of the victim's threats.* The defendant contends that the judge erred in allowing the Commonwealth's motion in limine to admit the testimony of Kirsha Hilliard and Troy Edmondson that the victim threatened to throw rocks at or

---

[22]The defendant's mother is Hill's aunt.

otherwise destroy what he believed to be the defendant's house if he did not get his money back. Because the defendant objected to the admission of this evidence at trial, "we review under the prejudicial error standard." *Commonwealth* v. *Sharpe*, 454 Mass. 135, 141 (2009).

The threatening remarks the victim made to Kirsha and Edmondson are admissible only if there was also evidence presented to the jury that the defendant learned of such remarks before the killing and that the victim's threat provided a motive for the defendant to kill the victim. See *Commonwealth* v. *Qualls*, 425 Mass. 163, 167-168 (1997), *S.C.*, 440 Mass. 576 (2003) (*Qualls*). As we stated in *Qualls, supra*:

> "The state-of-mind exception to the hearsay rule calls for admission of evidence of a murder victim's state of mind as proof of the defendant's motive to kill the victim when and only when there also is evidence that the defendant was aware of that state of mind at the time of the crime and would be likely to respond to it. . . . A murder victim's attitude of contempt or hostility toward the defendant, when it is known to the defendant, would constitute some evidence which, augmented by other evidence, might warrant a fact finder's determination that the defendant responded by killing the victim. However, a victim's contempt for the defendant or hostile attitude toward him, unknown to the defendant, would be irrelevant and inadmissible at the defendant's trial for murder."

There need not be direct evidence that the defendant learned of the victim's state of mind, so long as "the jury could have reasonably inferred" that he did learn of it. *Id.* at 170, quoting *Commonwealth* v. *Weichell*, 390 Mass. 62, 74 (1983), cert. denied, 465 U.S. 1032 (1984). See *Commonwealth* v. *Sharpe, supra* at 142-143; *Commonwealth* v. *Purcell*, 423 Mass. 880, 882-883 (1996) ("Where . . . the jury were warranted in inferring that the defendant knew of the victim's state of mind, evidence of the victim's statement was admissible . . . to show both the victim's state of mind and the defendant's motive to kill her").

Although Wanda Franklin denied communicating the victim's threat to her son, there was abundant evidence in the record to

allow a jury to infer that the defendant learned of this threat and that it was a motive in the killing. The jury were entitled to credit the 2007 grand jury testimony of Hill that the defendant told him that he knew the victim had threatened to throw rocks at his mother's house, and that the defendant suggested to him that this threat was a motive in the shooting. The jury reasonably could also infer that the defendant telephoned Robinson to ask him, "Where's that white boy you were with?" because he knew that the victim had just come to his house and made threats. Moreover, soon after his mother confronted him about what he was "doing outside," the defendant confronted the victim when he was with Edmondson behind the abandoned building and asked, "Who the fuck came by my house?"[23] Finally, just before the shots were fired, Nina Hall heard someone outside her house say, "You came to my house being disrespectful."

We conclude that the judge did not err in admitting either Kirsha's or Edmonson's descriptions of the threats made by the victim because, from the totality of the evidence presented, the jury reasonably could have inferred that the defendant knew of the victim's hostile threats against his mother's house when the shooting occurred and that the killing was motivated at least in part by these threats.

2. *Absence of eyewitness identification instruction.* On the fifth day of the trial, the judge asked counsel to let him know "as soon as possible" if they thought "that any additional [jury] instructions [would be] necessary." The judge specifically asked defense counsel if he was going to request an instruction on eyewitness identification. Defense counsel replied that he wanted to "think about that." The next day, during the charge conference, defense counsel did not request such an instruction, and the judge gave no specific instruction on eyewitness identification evidence in his final instructions to the jury. The judge, however, did instruct the jury that, "[i]n evaluating the credibility of a witness," they could "consider the ability, the op-

[23]The defendant argues that, because he questioned the identity of the individual who came to his house, this statement constituted "a demonstration that he did not even know the person's identity, much less the details of what was said." However, we conclude that the jury could reasonably infer from the course of events leading up to this question, and the defendant's aggressive tone, that this statement was more of an accusation than a question.

portunity, and the reliability of a witness to see or hear something in the past and then remember and later testify." The defendant made no objection to the judge's instructions. On appeal, the defendant contends that his attorney's failure to request a specific instruction on eyewitness identification, and his failure to object to the absence of such an instruction, constituted ineffective assistance of counsel resulting in a substantial likelihood of a miscarriage of justice.

"Where, as here, the defendant has been convicted of murder in the first degree, 'we consider his claim of ineffectiveness of counsel to determine whether there exists a substantial likelihood of a miscarriage of justice, as required under G. L. c. 278, § 33E, which is more favorable to a defendant than the constitutional standard for determining ineffectiveness of counsel.' " *Commonwealth* v. *Walker*, 460 Mass. 590, 598 (2011) (*Walker*), quoting *Commonwealth* v. *Gonzalez*, 443 Mass. 799, 808 (2005). Under this more favorable standard of review, where defense counsel is claimed to be ineffective because he failed timely to object to an alleged trial error, we need not consider whether the failure to object fell measurably below the conduct expected from an ordinary fallible lawyer, but determine instead "whether there was error and, if so, whether the error was 'likely to have influenced the jury's conclusion.' " *Walker*, *supra*, quoting *Commonwealth* v. *Gonzalez*, *supra*. Here, the defendant contends that defense counsel erred both in failing to request an identification instruction and in failing to object to what the defendant characterizes as the judge's error in failing to give such an instruction even in the absence of a request. We need not address the alleged inadequacy of counsel's conduct, because we conclude that the absence of a specific eyewitness identification instruction, including an instruction on the possibility of a good faith error in identification, was not "likely to have influenced the jury's conclusion." *Walker*, *supra*, quoting *Commonwealth* v. *Gonzalez*, *supra*.

"We have long recognized that '[e]yewitness identification of a person whom the witness had never seen before the crime or other incident presents a substantial risk of misidentification and increases the chance of a conviction of an innocent defendant.' " *Commonwealth* v. *Silva-Santiago*, 453 Mass. 782, 796

(2009), quoting *Commonwealth* v. *Jones*, 423 Mass. 99, 109 (1996). See *Commonwealth* v. *Johnson*, 420 Mass. 458, 465 (1995) ("mistaken identification is believed widely to be the primary cause of erroneous convictions"). We have also long recognized that, where the reliability of a positive eyewitness identification is an important issue at trial, a judge should instruct the jury regarding the evaluation of eyewitness identification testimony, including the possibility of a good faith error in identification, where such an instruction is requested by the defendant. See *Commonwealth* v. *Pressley*, 390 Mass. 617, 619 (1983) (error for judge to refuse to give instruction regarding good faith error in identification after request by defendant unless "the parties are so well known to each other or so closely related that under sufficient lighting and with appropriate physical proximity, the identification by the victim is either true or the victim is lying"); *Commonwealth* v. *Bowden*, 379 Mass. 472, 482-484 (1980). See *State* v. *Green*, 86 N.J. 281, 292 (1981) (where reliability of eyewitness identification witness is "crucial issue," defendant is entitled, on request, to jury instruction on identification that provides guidance to jury "on how to analyze and consider the factual issues with regard to the trustworthiness of [alleged victim's] in-court identification"); *State* v. *Long*, 721 P.2d 483, 492 (Utah 1986) ("in cases tried from this date forward, trial courts shall give such an instruction whenever eyewitness identification is a central issue in a case and such an instruction is requested by the defense").

The identification instruction we have approved was crafted to assist a jury in evaluating the reliability of a positive identification of the defendant as the perpetrator of the crime by a witness.[24] See *Commonwealth* v. *Walker*, 421 Mass. 90, 99 (1995), quoting

---

[24]The instructions on eyewitness identification approved in *Commonwealth* v. *Rodriguez*, 378 Mass. 296, 310-311 (1979) (Appendix), as modified in *Commonwealth* v. *Cuffie*, 414 Mass. 632, 640-641 (1993) (Appendix), and *Commonwealth* v. *Santoli*, 424 Mass. 837, 845 (1997), are as follows:

"One of the most important issues in this case is the identification of the defendant as the perpetrator of the crime. The Government has the burden of proving identity beyond a reasonable doubt. It is not essential that the witness himself be free from doubt as to the correctness of his statement. However, you, the jury, must be satisfied beyond a reasonable doubt of the accuracy of the identification of the defendant

*Commonwealth* v. *Fitzpatrick*, 18 Mass. App. Ct. 106, 110

before you may convict him. If you are not convinced beyond a reasonable doubt that the defendant was the person who committed the crime, you must find the defendant not guilty.

"Identification testimony is an expression of belief or impression by the witness. Its value depends on the opportunity the witness had to observe the offender at the time of the offense and to make a reliable identification later.

"In appraising the identification testimony of a witness, you should consider the following:

"Are you convinced that the witness had the capacity and an adequate opportunity to observe the offender?

"Whether the witness had an adequate opportunity to observe the offender at the time of the offense will be affected by such matters as how long or short a time was available, how far or close the witness was, how good were lighting conditions, whether the witness had had occasion to see or know the person in the past.

"In general, a witness bases any identification he makes on his perception through the use of his senses. Usually the witness identifies an offender by the sense of sight — but this is not necessarily so, and he may use other senses.

"Are you satisfied that the identification made by the witness subsequent to the offense was the product of his own recollection? You may take into account the circumstances under which the identification was made.

"If the identification by the witness may have been influenced by the circumstances under which the defendant was presented to him for identification, you should scrutinize the identification with great care.

"You may also consider the length of time that lapsed between the occurrence of the crime and the opportunity of the witness, some time after the occurrence of the crime, to see and identify the defendant as the offender, as a factor bearing on the reliability of the identification.

"You may also take into account that an identification made by picking the defendant out of a group of similar individuals is generally more reliable than one which results from the presentation of the defendant alone to the witness.

"You may take into account any occasions in which the witness failed to make an identification of defendant, or made an identification that was inconsistent with his identification at trial.

"Finally, you must consider the credibility of each identification witness in the same way as any other witness, consider whether he is

(1984) ("The [instruction approved in *Commonwealth* v. *Rodriguez*, 378 Mass. 296, 310-311 (1979) (Appendix),] addresses the question, 'Is the identification of the defendant as the perpetrator of the crime free of unnecessarily suggestive influences and compelling enough to support a verdict of guilty?' "). We now recognize that eyewitness identification may be an important issue at trial even where no eyewitness made a positive identification of the defendant as the perpetrator, but where eyewitnesses have provided a physical description of the perpetrator or his clothing, or have identified a photograph in an array as someone who looks like the perpetrator. Further, we now recognize that in such cases, where requested by the defendant, a judge should provide specific guidance to the jury regarding the evaluation of such eyewitness testimony through some variation of the approved identification instruction. Cf. Jury Instructions Issued by New Jersey Supreme Court, Identification: Out-of-Court Identification Only, at 1 (effective Sept. 4, 2012) (providing that instruction should be given where "[defendant], as part of [his/her] general denial of guilt, contends that the State has not presented sufficient reliable evidence to establish beyond a reasonable doubt that [he/she] is the person who committed the alleged offense"). However, in the circumstances of this case, we are not persuaded that an identification instruction, including

truthful, and consider whether he had the capacity and opportunity to make a reliable observation on the matter covered in his testimony.

"I again emphasize that the burden of proof on the prosecutor extends to every element of the crime charged, and this specifically includes the burden of proving beyond a reasonable doubt the identity of the defendant as the perpetrator of the crime with which he stands charged. If after examining the testimony, you have a reasonable doubt as to the accuracy of the identification, you must find the defendant not guilty."

Further, as we held in *Commonwealth* v. *Pressley*, 390 Mass. 617, 620 (1983), "Fairness to a defendant compels the trial judge to give an instruction on the possibility of an honest but mistaken identification when the facts permit it and when the defendant requests it." See *Commonwealth* v. *Pires*, 453 Mass. 66, 71-72 (2009) ("better course is to include in the *Rodriguez* instruction the language set forth in the *Pressley* case," because "[t]here is no harm in including such language, when the evidence so warrants and when a defendant requests the instruction, and it will help to ensure that the jury understand 'the thrust' of the *Rodriguez* instruction — i.e., that a witness might simply be mistaken").

an instruction on good faith error in identification, would have been "likely to have influenced the jury's conclusion." See *Walker, supra* at 598.

The defendant specifically contends that, "[b]y failing to request an identification instruction, the jury [were] left to make judgments about the testimony of Ms. Luyo and Mr. Edmondson without any instruction to educate and guide their analysis." We note first that the jury *were* provided an instruction "to guide their analysis" of the reliability of each witness's testimony, in that they were informed that they could "consider the ability, the opportunity, and the reliability of a witness to see or hear something in the past and then remember and later testify." We conclude that it is not likely that the guidance provided by the identification instruction approved by this court at the time of trial, or some variation thereof, would have influenced the jury's conclusion regarding the reliability of either Luyo's or Edmondson's contested testimony, and that it is even less likely that such an instruction would have affected the jury's verdict.

Although Luyo suggested, when she was presented with the photographic array, that the shooter looked similar to the defendant, she explicitly testified, both on direct and cross-examination, that she told the officers that she "was not sure" of her identification. Even the prosecutor admitted in his closing argument that Luyo, by this equivocal statement, "didn't ID the defendant." In view of the prosecutor's concession and Luyo's expressed uncertainty, we do not find it likely that the jury's evaluation of the reliability of her eyewitness testimony would have been substantially influenced by an identification instruction had one been given.

As to Edmondson's testimony that he identified the defendant and the victim running through a yard toward Farrington Street shortly before the shooting, defense counsel on cross-examination elicited many reasons why the jury should not credit his account. Edmondson admitted at trial that he had at least ten prior criminal convictions, that he was an alcoholic, that he was under the influence of alcohol that morning, and that he had been drinking most of the previous evening. He further admitted that his view was partially obstructed by a dirt mound, and that he testified at the grand jury that he had only seen the defendant run-

ning, not the victim, and that he had only glimpsed the defendant "[o]ut of the corner of [his] eye." Considering the information elicited in his cross-examination, we doubt that an instruction on identification would have substantially influenced the weight, if any, the jury ascribed to this testimony.

It is even less likely that the standard instruction on identification would have influenced the jury's verdicts, because the evidence was overwhelming that the defendant had sold the victim fake crack cocaine earlier that morning, that the victim was outraged by the fraud and threatened to damage the defendant's residence if the money was not returned, and that the defendant was angered by the victim coming to his mother's home and making this threat. None of these facts turned on identification testimony. The strongest evidence that the defendant was the perpetrator of the crime did not come from Luyo's identification of the defendant's photograph in the array as a person who "looked like" the shooter, but from Nina Hall's testimony that, immediately before the gunshots were fired, she heard a man outside 24 Farrington Street say, "You came to my house being disrespectful," and that she heard someone say something about fifteen dollars. An identification instruction would not have affected the jury's evaluation of Hall's testimony. Further, even absent Luyo's and Edmondson's contested testimony, the jury were entitled to credit Carlos Hill's 2007 grand jury testimony that the defendant had confessed to him that he shot the victim.

For these reasons, we conclude that the absence of a specific identification instruction was not likely to have influenced the jury's verdicts and, therefore, did not result in a substantial likelihood of a miscarriage of justice.

3. *The prosecutor's closing argument.* The defendant claims that the prosecutor made three improper statements in his closing argument. Because defense counsel made no objection to the prosecutor's closing argument, we review this claim to determine whether the prosecutor's argument was improper and whether any impropriety therein resulted in a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Lao*, 460 Mass. 12, 21 (2011), citing *Commonwealth* v. *Wright*, 411 Mass. 678, 681 (1992). We conclude that the prosecutor made only

one improper statement in his closing argument and that it created no such substantial likelihood.

First, the defendant correctly notes that the prosecutor told the jury that Edmondson testified that "the defendant said, 'You fucking came to my house,' " when Edmondson actually testified that the defendant said, "Who the fuck came by my house?" We conclude that this error was inconsequential because it was plain from Edmondson's testimony that the defendant confronted the victim as if he knew that the victim had come to his house, and that he was not asking the identity of the person who had come.

Second, the defendant contends that the prosecutor erred when, in arguing that the "kid" Adam Thayer observed cutting through his backyard just before and just after the shooting was not the defendant, he told the jury that "the only person who said anything about a whitish hat was Adam Thayer." The defendant argues that this was an erroneous factual assertion because both Anthony Robinson and Imani Bell-Hilliard identified the defendant's hat as at least partially white. We find no error because a "whitish" hat is different from a hat with several colors that is partially white, and Thayer was the only witness who testified to a person wearing a white hat.

Third, the defendant argues that the prosecutor created a substantial likelihood of a miscarriage of justice when he agreed with the judge at the charge conference that no instruction on the defendant's consciousness of guilt was necessary and then suggested in his closing argument that Carlos Hill's 2007 grand jury testimony was more "plausible" than his trial testimony because it was more likely that the defendant went to Florida "because he had shot somebody on Farrington Street" than "because he had to pay probation some fines." Where the jury had to choose whether to credit Hill's 2007 grand jury testimony or his inconsistent testimony at trial, this was fair argument. Moreover, even if the jury understood from the prosecutor's statement that he was suggesting that the defendant's travel to Florida after the shooting reflected his consciousness of guilt, there was no impropriety because the prosecutor did not promise not to make such a suggestion and a jury instruction on consciousness of guilt is not a precondition to a prosecutor arguing

evidence suggesting a defendant's consciousness of guilt. See *Commonwealth* v. *Simmons,* 419 Mass. 426, 435-436 (1995) (in absence of request, judge may exercise discretion not to instruct on consciousness of guilt; "[c]ounsel at the trial might wish only to discuss evidence suggesting consciousness of guilt in closing arguments or simply to leave it for the jury's reflection unadorned by comment either by them or the judge").

4. *Review under G. L. c. 278, § 33E.* The defendant argues that this court should exercise its authority under G. L. c. 278, § 33E, to grant him a new trial because the large number of inconsistencies in the testimony of various witnesses shows that "the verdict was against the weight of the evidence."

Section 33E "give[s] us the power and the duty exercised by a trial judge upon a motion for a new trial . . . to set aside a verdict when in his [or her] judgment it is so greatly against the weight of the evidence as to induce in his [or her] mind the strong belief that it was not due to a careful consideration of the evidence, but that it was the product of bias, misapprehension or prejudice." *Commonwealth* v. *Jefferson,* 416 Mass. 258, 265 (1993) (*Jefferson*), quoting *Commonwealth* v. *Gricus,* 317 Mass. 403, 406 (1944) (*Gricus*). Section 33E, however, "does not . . . convert this court into a second jury, which must be convinced beyond a reasonable doubt of the guilt of a defendant by reading the reported evidence, without the advantage of seeing and hearing the witnesses." *Jefferson, supra,* quoting *Gricus, supra.* "For a trial judge, or for this court under the statute . . . to grant a new trial on the ground that the verdict was against the weight of the evidence, it must appear that the verdict, if allowed to stand, would work a miscarriage of justice." *Jefferson, supra* at 266, quoting *Gricus, supra* at 407. "It is not enough that the judge or judges, if on the jury, would have felt a reasonable doubt which the jury did not share." *Jefferson, supra,* quoting *Gricus, supra.*

In this case, we recognize that the Commonwealth did not eliminate the theoretical possibility that, while the defendant and the victim were in the midst of an angry dispute over the defendant's sale of fake crack cocaine and the victim's subsequent threats to damage the defendant's mother's home, an unidentified third person fired five shots at the victim, shooting him in

the back. There was evidence that a third person was nearby when the shots were fired: Adam Thayer saw a "kid" wearing a white hat walk through a hole in a fence leading to the backyard of 24 Farrington Street seconds before the shooting and run back through that hole seconds after the shooting, and Robert Fuqua, shortly after the shooting, saw a second man approach the victim and flee the scene moments after an armed man had done the same. But, as this court originally announced in 1850, "reasonable doubt . . . . is not mere possible doubt," *Commonwealth* v. *Webster*, 5 Cush. 295, 320 (1850), and the great weight of the evidence established that the defendant was the shooter, not this unidentified third person.

The defendant was outraged by the victim having come to his mother's home and threatening to throw rocks at it unless he was repaid. Nina Hall heard this dispute articulated outside 24 Farrington Street moments before the shots were fired. The jury were entitled to credit the evidence that the victim admitted to his cousin, Carlos Hill, that he committed the shooting. While Hill claimed at trial that the defendant never confessed the crime to him and that he mistakenly had attributed information to the defendant that he had learned from others, the confession he described provided details that closely conformed with, and were corroborated by, the other evidence in the case. The defendant's conduct after the shooting also supported the inference that he was the shooter, because he did not flee to his mother's home after the shooting but instead fled past his mother's home and did not return for at least several weeks. While there was inconsistent testimony regarding the clothing worn by the defendant and by the shooter, the weight of the evidence was that the shooter wore a dark baseball cap consistent with a Boston Celtics hat that the defendant was wearing that morning, not the white cap worn by the "kid" who walked into the scene of the shooting through the hole in the fence.

Having carefully reviewed the trial record, we are convinced that the weight of the evidence supports the jury's verdict of murder in the first degree, and we therefore decline to exercise our extraordinary authority to grant relief under G. L. c. 278,

§ 33E, either to order a new trial or to reduce the severity of the verdict.[25]

*Conclusion.* None of the defendant's claims on appeal warrants reversal of the convictions, and the interests of justice do not require the entry of a verdict of a lesser degree of guilt or a new trial pursuant to G. L. c. 278, § 33E.

*Judgments affirmed.*

---

[25]Just as we conclude that the jury were justified in finding that the defendant was the man who shot the victim to death, we also conclude that their verdict that he did so with deliberate premeditation was consonant with justice. In so concluding, we note that there was no evidence presented suggesting that, when the shooter killed the victim, he was acting in self-defense or on sudden provocation.