NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11567

COMMONWEALTH  vs.  KENNETH JOHNSON.


Suffolk.     September 2, 2014. - January 12, 2015.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk,
& Hines, JJ.


Identification.  Evidence, Identification.  Practice, Criminal,
    Request for jury instructions, Instructions to jury.



Indictments found and returned in the Superior Court
Department on June 11, 2001.

Following review by the Appeals Court, 74 Mass. App. Ct.
1129 (2009), the cases were tried before Patrick F. Brady, J.

The Supreme Judicial Court on its own initiative
transferred the case from the Appeals Court.


Brad P. Bennion for the defendant.
Cailin M. Campbell, Assistant District Attorney (David S.
Bradley, Assistant District Attorney, with her) for the
Commonwealth.
David W. Ogden, Daniel S. Volchok, Francesco Valentini, &
Natalie F.P. Gilfoyle, of the District of Columbia, & John C.
Polley, for American Psychological Association & another, amici
curiae, submitted a brief.
M. Chris Fabricant & Karen Newirth, of New York, Joshua D.
Rogaczewski & Johnny H. Walker, of the District of Columbia, &
Kevin M. Bolan, for the Innocence Network, amicus curiae,
submitted a brief.

GANTS, C.J.  In Commonwealth v. Franklin, 465 Mass. 895, 912 (2013), we recognized "that eyewitness identification may be an important issue at trial even where no eyewitness made a positive identification of the defendant as the perpetrator, but where eyewitnesses have provided a physical description of the perpetrator or his clothing, or have identified a photograph in an array as someone who looks like the perpetrator," and we declared that, "where requested by the defendant, a judge should provide specific guidance to the jury regarding the evaluation of such eyewitness testimony through some variation of the approved identification instruction."  Here, the eyewitnesses described only the defendant's gender and race, and the color of his shorts; identified other individuals as the perpetrator when shown a live lineup; and made no in-court identification.  The trial judge declined the defendant's request to give a variant of the approved identification instruction that included the directive, "You may take into account whether a witness ever participated in an identification procedure and failed to identify the defendant as the perpetrator."  We conclude that the judge did not abuse his discretion in declining to give the proposed instruction where there was no positive identification and no other eyewitness testimony that significantly

incriminated the defendant.  Therefore, we affirm the defendant's convictions.[1]

Background.  On December 10, 2004, the defendant was convicted by a Superior Court jury of (1) assault by means of a dangerous weapon, in violation of G. L. c. 265, § 15B (b); (2) possession of a firearm without a license, in violation of G. L. c. 269, § 10 (a); (3) possession of ammunition without a firearm identification card, in violation of G. L. c. 269, §§ 10 (h); (4) armed carjacking, in violation of G. L. c. 265, § 21A; and (5) armed robbery, in violation of G. L. c. 265, §17.  On August 11, 2009, in an unpublished memorandum and order pursuant to its rule 1:28, the Appeals Court vacated the judgments against the defendant due to an erroneous joint venture instruction and ordered a new trial.  See Commonwealth v. Johnson, 74 Mass. App. Ct. 1129 (2009).  At the conclusion of a new trial, on April 12, 2011, the jury convicted the defendant of all charges.  The defendant filed a timely notice of appeal, and we transferred the case to this court on our own motion.

We summarize the evidence at trial.  On April 22, 2001, at approximately 6 P.M., Nerys Ramirez drove his girl friend, Erica Jusino, and their two year old son to a park in the Roxbury section of Boston.  At the park, Ramirez noticed that a gray or

_____

[1] We acknowledge the amicus briefs submitted by the Innocence Network and by the American Psychological Association and the Center for Law, Brain & Behavior.

tan colored[2] Jeep Grand Cherokee automobile was parked very close to his green Jeep Grand Cherokee, on which he had installed tire rims and other accessories.  Ramirez testified that two people got out of the gray Jeep and looked at his green Jeep over the course of twenty to twenty-five minutes.

Ramirez and his family remained in the park for approximately one and one-half hours.  On leaving and beginning the drive home, Ramirez noticed that the gray Jeep and a motorcycle were following him, even after he had stopped at a convenience store.  The motorcycle eventually passed Ramirez, but the gray Jeep continued to follow.  Ramirez then pulled into the driveway of his house located in the Hyde Park section of Boston and parked his vehicle approximately twenty feet from the front door of his house.  The gray Jeep remained on the street.

After Ramirez reached the front door of his house, two black men went up to him and asked for someone's name, but Ramirez did not speak English at the time and did not understand the question.  The defendant, who was wearing blue shorts, pulled out a black revolver, pointed it at Ramirez, and asked him to give up whatever he had.  Ramirez gave his watch, bracelet, rings, and wallet to the other man (who was not holding the gun), later identified as Raymond Sledge.  Sledge

---

[2] At trial, witnesses described the color of this Jeep automobile as gray, grayish, tan, tannish, grayish-tannish, gold, and brown.  We will refer to this Jeep as the gray Jeep.

then took Ramirez's automobile keys, cellular telephone, and pager.

Jusino, who had been inside the green Jeep with her son, started walking toward the house. As she approached, Ramirez told her that he was being robbed, but she continued walking toward him until the defendant pointed the gun at her stomach.[3] Ramirez testified that the defendant then got into the gray Jeep and Sledge got into Ramirez's green Jeep.[4] Jusino, however, testified that Sledge got into the gray Jeep while the defendant kept the weapon pointed at Ramirez and her, and later drove off in Ramirez's green Jeep. The assailants departed the scene in the two Jeeps, driving in the same direction.

Jusino used her set of keys to enter the house and called the police. Officer Robert Lawler[5] arrived at Ramirez's house

---

[3] Erica Jusino was eight and one-half months pregnant at the time.

[4] At the previous trial, Nerys Ramirez had testified that the gunman got into the green Jeep and the man without the gun got into the gray Jeep. However, after Ramirez was cross-examined with this inconsistency, the jury learned on redirect examination that, at the grand jury proceeding in 2001, Ramirez had explained that the gunman kept pointing the weapon at him while the other man got into the green Jeep.

[5] Officer Robert Lawler was retired and unavailable at the time of trial, so his prior testimony from the 2004 trial was read aloud to the jury.

approximately five minutes later, around 9 P.M.[6] After speaking briefly with Jusino, Officer Lawler broadcast on the police radio that the robbers were two black males, one driving a green Jeep that belonged to the victims, and one wearing blue shorts, armed with a handgun, and driving a gray Jeep.

Officer Brian Foley was parked nearby when he heard Officer Lawler's broadcast, and saw two Jeeps matching Officer Lawler's description driving toward him. He followed the Jeeps and, with the assistance of other officers, succeeded in stopping them a few miles from the scene of the crime.[7] Officer James Thompson and Officer Foley approached the gray Jeep, and Officer Thompson removed the defendant from the vehicle and frisked him, recovering a black revolver loaded with five bullets. The defendant was wearing blue shorts when arrested. Meanwhile, Officer Kevin Doogan secured Sledge, who was driving the green Jeep. Officer Doogan frisked Sledge and found a cache of gold jewelry. However, he left the jewelry in Sledge's pocket to be searched at the police station. Officer Foley searched Sledge at the station and recovered three gold rings, one heavyweight

---

[6] The telephone call to the police was placed approximately seven minutes after the robbery. Jusino testified that Ramirez's set of house keys was stolen along with the car keys, so she had to find another set of house keys.

[7] Officer Lawler testified that it took less than five minutes to drive from Ramirez's residence to where the stop was made.

chain necklace, one bracelet, an autographed fifty dollar bill, and an autographed twenty dollar bill. Ramirez later identified these items as his own.

Officer Thompson searched the green Jeep and recovered Ramirez's wallet. Officer James Martin searched the gray Jeep at the scene and at the station. At the scene, he recovered a Motorola cellular telephone and a pager. At the station, he recovered a compact disc holder, a gold watch, a leather or vinyl card holder, and a jacket with a wallet holding a Massachusetts driver's license that belonged to Sledge. At the station, Ramirez identified his automobile keys, cellular telephone, and pager.

No showup identification was attempted on the night of the arrest. The first identification procedure was conducted on May 10, 2001, when Ramirez and Jusino went to Boston police headquarters to view a live lineup.[8] During the eighteen days between the night of the robbery and the lineup, the defendant's hair style changed; his hair was styled in a "medium Afro" on April 22 but was fashioned into twists or braids on May 10. The defendant was included in the eight-person lineup as participant no. 4; Sledge was not included. When viewing the lineup, Ramirez asked three people to step forward, including the

---

[8] The lineup procedure was audio and video recorded, but the tape was lost before the 2004 trial and not found at the time of the 2011 trial.

defendant. He then selected participant no. 6, not the defendant. Jusino separately viewed the same lineup, and she selected a different individual than Ramirez did, but not the defendant.[9]

Discussion. Although neither eyewitness identified the defendant at the live lineup, the defendant requested a modified identification instruction providing that the jury may consider that the witnesses had an opportunity to view the defendant but did not identify him.[10] The judge inquired, "There was no I.D.,

---

[9] Ramirez and Jusino each identified Raymond Sledge in a separate lineup.

[10] The defendant's requested instruction, in full, stated:

"One of the most important issues in this case is the identification of the defendant as the perpetrator of the crime. The Commonwealth has the burden of proving the identity of the perpetrator beyond a reasonable doubt.

"It is not essential that any witnesses themselves are free from doubt as to the correctness of their identification of the perpetrator.

"However, you the jury, must be satisfied beyond a reasonable doubt as to the identity of the defendant as the perpetrator of the crimes with which he stands charged before you may convict him. If you are not convinced beyond a reasonable doubt that the defendant was the person who committed the crime, you must find the defendant not guilty.

"You may take into account that any identification that was made by picking the perpetrator out of a group of similar individuals is generally more reliable than one which results from the presentation of a suspect alone to a witness.

so why should I give an I.D. charge?" Defense counsel said, "I just want the jury to be able to consider the fact that they had an opportunity to view this defendant . . . ." The judge reasoned that "[t]he model I.D. instruction only applies if somebody's identified." The judge denied the request, stating that the failure to identify the defendant was a matter for the attorneys to address to the jury in closing argument, and requires no special instruction. The defendant objected to the denial of the instruction at the conclusion of the judge's charge.

The issue on appeal is not whether a judge may instruct a jury regarding a witness's failure to identify the defendant; it is certainly within a judge's discretion to do so. Rather, the issue is whether the judge abused his discretion in declining to give the instruction requested here by the defendant, where there was no positive eyewitness identification, only a physical description of the suspect limited to his race, his gender, and

---

"You may take into account whether a witness ever participated in an identification procedure and failed to identify the defendant as the perpetrator.

"I again emphasize that the Commonwealth has the burden of proof on every element of the crime charged, and this specifically includes the burden of proving beyond a reasonable doubt the identity of the defendant as the perpetrator of the crimes with which he stands charged. If, after examining the testimony, you have a reasonable doubt as to the identity of the defendant as the perpetrator of the crimes with which he stands charged, you must find the defendant not guilty."

the color of his shorts.  Because the defendant properly objected to the judge's denial of the modified instruction, we review the judge's decision for prejudicial error.  See Commonwealth v. Cruz, 445 Mass. 589, 591 (2005).

"We have long recognized that '[e]yewitness identification of a person whom the witness had never seen before the crime or other incident presents a substantial risk of misidentification and increases the chance of a conviction of an innocent defendant.'"  Commonwealth v. Silva-Santiago, 453 Mass. 782, 796 (2009), quoting Commonwealth v. Jones, 423 Mass. 99, 109 (1996).  See Commonwealth v. Johnson, 420 Mass. 458, 465 (1995) ("There is no question that the danger of mistaken identification by a victim or a witness poses a real threat to the truth-finding process of criminal trials").  "We have also long recognized that, where the reliability of a positive eyewitness identification is an important issue at trial, a judge should instruct the jury regarding the evaluation of eyewitness identification testimony . . . ."  Franklin, 465 Mass. at 910.  See Commonwealth v. Williams, 54 Mass. App. Ct. 236, 239 (2002) ("The cases make plain that judges should furnish jurors with a set of practical criteria by which they can assess the quality of an asserted identification . . .").  More recently, in Franklin, supra at 912, we recognized that, where requested by the defendant, a judge should also provide a modified

instruction regarding the evaluation of eyewitness identification testimony where "no eyewitness made a positive identification of the defendant as the perpetrator, but where eyewitnesses have provided a physical description of the perpetrator or his clothing, or have identified a photograph in an array as someone who looks like the perpetrator."

Here, the two eyewitnesses to the crime, Ramirez and Jusino, identified lineup "fillers," persons who had nothing to do with the case, rather than the defendant at a live lineup and provided only the most general description of the suspect's race, gender, and blue shorts. The defendant does not contend that this description is so singular as to serve as a partial identification. Nor would the modified instruction proposed by the defendant have invited the jury to evaluate the witnesses' description of the gunman as a black man wearing blue shorts. In fact, the defendant does not contend that there was a risk of misidentification arising from any of the identifying information presented at trial.[11]

---

[11] We acknowledge that Commonwealth v. Franklin, 465 Mass. 895 (2013), had not been decided at the time of the defendant's trial. However, even if the defendant had requested a modified instruction to caution the jury regarding the witnesses' description of him, the description was too generic to require a modified instruction under Franklin. The description of a defendant's race, gender, and blue shorts are not details so specific to the defendant that they essentially serve as a partial eyewitness identification. Contrast with id. at 900-901, 903 (one eyewitness saw defendant and victim from

Rather, the defendant essentially contends that, even where there was no positive or partial identification of the defendant, he was entitled to a jury instruction that would have informed the jury, first, that the Commonwealth bears the burden of proving beyond a reasonable doubt the identity of the defendant as the perpetrator of the crime, and, second, that they may take into account the failure of the witnesses at the lineup to identify the perpetrator.  We conclude that the jury were already told the first proposition through the reasonable doubt instruction, and needed no instruction to understand the second proposition.

The purpose of the identification instruction "is to emphasize the importance of eyewitness identifications, [to] inform the jury of the Commonwealth's heavy burden of proof as to the accuracy of the identification, and to furnish the criteria by which the jury can assess the quality of the identification."  Commonwealth v. Walker, 421 Mass. 90, 99 (1995).  Here, there was no incriminating eyewitness identification testimony of consequence that the jury needed to evaluate as to accuracy, importance, or quality.  Where there is incriminating eyewitness identification testimony offered by a

---

"shoulders up" running prior to shooting, and another eyewitness who saw shooting declared during photographic array that shooter "looked like" defendant but had hair like another person depicted in array).

witness, our new provisional model instruction, like our earlier model instruction, allows the jury to consider any failure of the witness to identify the defendant in a prior identification procedure when evaluating the accuracy and weight of the incriminating identification evidence.  See Commonwealth v. Gomes, ante    ,     (Appendix) (2014) (provisional model instruction allowing jury to consider witness's failure to identify defendant); Commonwealth v. Rodriguez, 378 Mass. 296, 310-311 (Appendix) (1979) (former model instruction providing same guidance).  Where there is no incriminating eyewitness identification testimony, a witness's failure to identify the defendant is not part of the jury's evaluation of identification evidence but simply exculpatory evidence indicating that the defendant was not the perpetrator, which the jury may weigh in light of the totality of the evidence.  Because, here, there was no identification testimony that significantly incriminated the defendant, the judge did not abuse his discretion in declining to give the modified identification instruction.

Of course, the jury are entitled to consider the witnesses' failure to identify the defendant, and they did so in this case. Officer Doogan testified on both direct and cross-examination that Ramirez and Jusino did not identify the defendant but identified another lineup participant.  During opening statement and closing argument, defense counsel reiterated several times

that the defendant had appeared before both Ramirez and Jusino and neither had picked him as the culprit. The judge instructed the jury that they could take into account the witnesses' testimony and the exhibits, which included photographs of the defendant's live lineup. The judge also instructed the jury to weigh the witnesses' credibility, any inconsistencies, and the over-all plausibility of the testimony. The judge even instructed the jury to consider the failure to preserve the recording of the lineup procedure in evaluating the reliability of the evidence. Where there was no danger of eyewitness misidentification, the judge's "charge, as a whole, adequately cover[ed] the issue." Commonwealth v. Watson, 455 Mass. 246, 259 (2009), quoting Cruz, 445 Mass. at 597.

In Gomes, supra at  , we concluded that scientific principles that would assist juries in their evaluation of eyewitness identifications may be included in a model jury instruction where they are so generally accepted that there is a "near consensus in the relevant scientific community," and we identified various principles that met this standard. We have reviewed the scholarly research to determine whether there are generally accepted scientific principles that would meaningfully assist juries in their evaluation of the weight to give an eyewitness's failure to identify a defendant, where there is no positive or partial identification. We discovered from our

review that the breadth of research on eyewitness identification is not similarly found in the area of eyewitness nonidentification.[12]  See Charman & Wells, Applied Lineup Theory, in 2 Handbook of Eyewitness Psychology 251 (2007) (Charman & Wells); Wells & Olson, Eyewitness Identification:  Information Gain from Incriminating and Exonerating Behaviors, 8 J. Experimental Psychol.:  Applied 155, 164 (2002) (Wells & Olson). And we also discovered that what little has been established would not be of material assistance to a jury.

There is some agreement that, generally, a witness's failure to identify a defendant is at least somewhat indicative of innocence.  See Charman & Wells, supra at 225-226; Wells & Lindsay, On Estimating the Diagnosticity of Eyewitness Nonidentifications, 88 Psychol. Bull. 776, 778-779 (1980) (if witness's identification of suspect increases probability that suspect is perpetrator, then witness's declaration that perpetrator is not in lineup or witness's identification of filler as perpetrator must decrease probability that suspect is perpetrator).  But reasonable jurors would already know this based on their common sense.  What they might not know is what

---

[12] We characterize an eyewitness's "failure to identify" or "nonidentification" to include (1) a witness's assertion that the perpetrator is not among the persons shown in the lineup; (2) a witness's identification of a person other than the suspect in the photographic array or lineup; or (3) a witness's inability either to identify or to exclude the suspect as the perpetrator.

weight to give a failure to identify where there is neither a positive nor a partial identification.  The research provides little help in this regard, because there is no near consensus as to how much information is gained from a failure to identify. See Wells & Olson, supra ("[T]here has been virtually no dialogue in the eyewitness identification literature" concerning appropriate weight that should be given to witness's assertion that perpetrator is not in lineup, or to witness's identification of filler as perpetrator).  This is not a simple area of inquiry, because a failure to identify may be weighed differently depending on whether the eyewitness got a good, long, frontal look at close range of a perpetrator who was wearing no mask, or whether the eyewitness got only a momentary glance at a masked perpetrator fleeing the scene of the crime. See, e.g., Commonwealth v. Bourgeois, 404 Mass. 61, 63 (1989) (witness's nonidentification not shown to be exculpatory because "there [was] no evidence on the record . . . that the victim had such an opportunity to view the defendant as would have permitted the victim to identify the defendant").  In addition, an eyewitness's identification of a filler in a lineup as the culprit may be weighed differently from an assertion that no one in the lineup is the culprit, or that he or she does not know enough to choose or reject anyone.  See Charman & Wells, supra at 226; Clark, Howell, & Davey, Regularities in Eyewitness

Identification, 32 Law & Hum. Behav. 187, 207-208 (2008) (filler identifications "may be viewed as an indication of the witness's desire to make an identification despite having a weak memory of the target"); id. at 206 (witness inability either to identify or exclude suspect as perpetrator was shown to have "little or no probative value").  Until we are confident that we can materially aid the jury in their evaluation of a failure to identify based on principles that have attained near consensus in the relevant scientific community, we will not offer even a provisional model jury instruction regarding an eyewitness's failure to identify a defendant, where there is no positive or partial identification.  We therefore leave the question whether a jury instruction shall be given in these circumstances, and what it should say, to the sound discretion of the trial judge.

Conclusion.  The judge did not abuse his discretion by declining to give an identification instruction where there was no positive eyewitness identification or other eyewitness testimony that significantly incriminated the defendant.  Having found no error, we affirm the defendant's convictions.

So ordered.