NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-10837

COMMONWEALTH  vs.  ELYSEE BRESILLA.


Middlesex.     October 10, 2014. - January 16, 2015.

Present:  Gants, C.J., Cordy, Botsford, Lenk, & Hines, JJ.


Homicide.  Firearms.  Evidence, Firearm, Identification,
     Relevancy and materiality.  Identification.  Constitutional
     Law, Identification.  Due Process of Law, Identification of
     inanimate object.  Practice, Criminal, Capital case, Motion
     to suppress, Identification of defendant in courtroom,
     Conduct of prosecutor, Argument by prosecutor, Request for
     jury instructions, New trial.



     Indictments found and returned in the Superior Court
Department on June 6, 2006.

     Pretrial motions to suppress evidence were heard by Diane
M. Kottmyer, J; the cases were tried before Sandra L. Hamlin,
J., and a motion for a new trial, filed on August 12, 2011, was
considered by her.


     James W. Rosseel for the defendant.
     Fawn D. Balliro Andersen, Assistant District Attorney
(Nicole L. Allain, Assistant District Attorney, with her) for
the Commonwealth.


     CORDY, J.  In the early morning hours of March 28, 2006,

Doowensky Nazaire was shot and killed in front of a night club

in Cambridge.  Although the firearm was never recovered, the evidence implicating the defendant, Elysee Bresilla, as the shooter was substantial.  Within minutes of the shooting, Cambridge police officers found the defendant crouching in the yard of a nearby residence.  Within an hour, the police had performed a showup with a witness who identified the defendant as the shooter.  Two eyewitnesses who knew the defendant came forward and identified him as the shooter.  The defendant's hands tested positive for gunshot primer residue.  In the path of flight described by numerous witnesses, the police found the defendant's discarded brown leather jacket.  On the night of the shooting, two witnesses identified that jacket as the one worn by the shooter.

The defendant was indicted on charges of murder in the first degree under theories of premeditation and extreme atrocity or cruelty, and possession of a firearm without a firearm identification (FID) card, in violation of G. L. c. 269, § 10 (h) (1).  The defendant filed motions to suppress the identifications of himself and his jacket, which motions were denied.  At trial, the defendant primarily challenged the identification evidence and the procedures employed by the Cambridge police in obtaining that evidence.  A jury convicted the defendant of murder in the first degree on a theory of

deliberate premeditation, and he was sentenced to a mandatory term of life without the possibility of parole.

On appeal, the defendant raises numerous claims of error, including a contention that the Cambridge police should have presented witnesses with a "jacket lineup."  We reject that contention and find no reversible error arising from the defendant's other claims.  Although evidence of inappropriate conduct by some of the investigating police officers was brought out during the course of the proceedings, we conclude that there is an insufficient basis for exercising our authority under G. L. c. 278, § 33E, to order a new trial.  Accordingly, we affirm the defendant's conviction.

1.  Background.  a.  The murder.  We recite the facts in the record, reserving certain details for our analysis of the issues raised on appeal.  See Commonwealth v. Raposa, 440 Mass. 684, 686 (2004).  On the evening of March 27, 2006, the victim, Francillon Dabady, and Mackenson Mathurin went to a night club in Cambridge.  All three were acquainted with the defendant: the victim was the defendant's former roommate; Dabady had met the defendant at the victim's home; and Mathurin attended grade school with the defendant and, on the night of the shooting, conversed with him inside the club.  As the club closed, the victim, Dabady, and Mathurin, along with many other patrons, filed out onto Massachusetts Avenue.

On leaving the club, Dabady and Mathurin observed a man (whom they later identified as the defendant), holding a semiautomatic firearm, cross the street toward the crowd, aim the weapon at the victim, and fire multiple shots. One bullet struck the victim and sent him to the ground. Then, standing almost above the victim, the man shot him a second time before fleeing in the direction of a nearby video store. The Cambridge police were promptly notified of the shooting and, within one minute, Officer Mark McHale arrived at the night club.

Officer McHale was approached by a crowd of people shouting descriptions of the shooter. From the noise, Officer McHale distilled a description of a black male wearing a white T-shirt and baseball hat, which he then broadcast across Cambridge police radio. Sergeant John Gardner heard the broadcast and, within minutes, observed a black male fitting the description running down Essex Street, a few blocks away from the site of the shooting. Less than four minutes after being alerted to the shooting, Cambridge police officers found the defendant, clad in a white T-shirt and white baseball hat with dark pinstripes, crouching among the shrubs of a yard on Essex Street.

Meanwhile, Officer McHale was speaking with a witness named Daniel Jacobs. Jacobs claimed to have had a clear view of the shooter. After learning that a potential suspect had been apprehended, Officer McHale asked Jacobs if he would be willing

to observe a person who had been stopped in the area. Jacobs agreed, confirmed his understanding of the precautionary advisements given by Officer McHale, and traveled to Essex Street in Officer McHale's police cruiser. Although Officer McHale observed alcohol on Jacobs's breath, he determined that Jacobs was capable of providing an accurate statement and performing a reliable identification. On viewing the defendant, who was surrounded by police officers but did not appear to be handcuffed, Jacobs stated, "That's the guy."

As these events unfolded, other Cambridge police officers scoured the area in search of other evidence of the murder. In the parking lot behind the video store, which was located between the night club and the yard where the defendant was apprehended, the police found a multicolored button-up shirt and a light brown leather jacket with a fur collar and fur cuffs. One of the officers broadcast a description of the jacket over the police radio. The defendant overheard the broadcast and stated, "That's my jacket."

As the police secured the scene around the jacket, two other witnesses to the shooting, Sonny Bhatia and Fabio Mendes, were walking to their automobile, which was parked in the same parking lot. Bhatia and Mendes saw the jacket, and each identified it as the one worn by the shooter. David Vicini, the doorman at a nearby restaurant, reported seeing a man wearing a

light brown jacket with a fur collar standing over the victim, shooting. Other witnesses variously recalled seeing a brown leather jacket, a black leather jacket, a "bubble" jacket, or no jacket at all. Despite these inconsistencies, however, most of the descriptions were generally consistent with the defendant and the articles of clothing found in the parking lot. The victim was transported to a hospital, where he died from his wounds at approximately 3 A.M. The defendant was transported to the Cambridge police station, where his hands were swabbed for gunshot primer residue testing. Cambridge police officers questioned the defendant regarding the whereabouts of the gun, to which he responded, "I don't think you guys gonna find any guns." The defendant's booking photograph was placed in photographic arrays to be shown to several of the witnesses to the shooting.

On the same morning, Cambridge police arranged for Detective Daniel McNeil, a so-called "blind presenter," to conduct a photographic array procedure with Dabady. Dabady explained that an array was unnecessary, as he already knew the shooter. Nonetheless, Detective McNeil read to Dabady a list of advisements from the Cambridge police photographic identification checklist and presented him with a sequential array. Dabady identified the defendant as the shooter, which McNeil recorded on the checklist.

McNeil then conducted photographic array procedures with Mendes and Bhatia. Although each selected the defendant's photograph, neither was able to express confidence that the person in the photograph was the shooter. Approximately one month later, a different blind presenter, Detective Donald Mahoney, conducted a sequential photographic array procedure with Mathurin, who, along with Dabady, had been with the victim on the night of the shooting. Mahoney recited each of the advisements and Mathurin identified the defendant as the shooter. In addition, Cambridge police presented the defendant's sister, Shelly Bresilla, with a photograph of the jacket found in the parking lot. She recognized the jacket and the cellular telephone contained in one of its pockets as gifts she had given to the defendant.

b. The motions to suppress. Prior to trial, the defendant moved to suppress the showup identification by Jacobs, the photographic identifications by Dabady and Mathurin, and the jacket identifications made by Bhatia and Shelly Bresilla. A three-day evidentiary hearing was held on the motions. At some point during the course of the hearing, Detective Mahoney approached Bhatia in the hallway and showed him some photographs from the photographic array procedure in which Bhatia previously participated. Although both witnesses were sequestered, Detective Mahoney asked Bhatia if he remembered which photograph

he had selected and, when Bhatia responded in the negative, Detective Mahoney pointed to a photograph of the defendant and informed Bhatia that he had selected that photograph.

The motion judge sanctioned the Commonwealth by precluding Bhatia from identifying the defendant at trial either directly or through a photographic array, while preserving the defendant's right to elicit before the jury Bhatia's inability to positively identify the defendant's photograph. The motion judge also suggested that a midtrial voir dire be conducted to ensure that Bhatia would not make a surprise identification of the defendant during his testimony.

With respect to the merits of the motion to suppress, the judge found no error in the showup procedure used with Jacobs given the ongoing threat to public safety, the use of cautionary advisements by Detective McHale, Jacobs's professed ability to identify the shooter, and the fact that the showup occurred within one hour of the shooting. The judge also determined that the defendant failed to meet his burden of establishing that the photographic arrays shown to Dabady and Mathurin were unnecessarily suggestive, noting that the police had used blind presenters, that precautionary advisements had been given, and that both witnesses were already familiar with the defendant. The judge likewise rejected the defendant's challenge of the jacket identifications, concluding that the circumstances did

not render this the "extreme case" alluded to in Commonwealth v. Simmons, 383 Mass. 46, 51 (1981), S.C., 392 Mass. 45, cert. denied, 469 U.S. 196 (1984) (in "extreme case," suggestiveness of identification procedure of inanimate objects might rise to denial of due process).

c. The trial. The Commonwealth presented substantial evidence of the defendant's culpability, including the showup identification by Jacobs, the photographic identifications by Dabady and Mathurin, and the jacket identifications made by Mendes and Bhatia in the video store parking lot. The Commonwealth's expert witnesses opined that the jacket tested positive for the defendant's deoxyribonucleic acid (DNA), that both of the defendant's hands tested positive for gunshot residue primer, and that the ammunition recovered from the scene was consistent with having been fired from a Luger semiautomatic pistol. The jury also heard the testimony of Jacobs, who was standing within feet of the victim; Dabady and Mathurin, who knew the defendant and indentified him as the shooter; Bhatia, Mendes, and Vicini, who identified the jacket as the one worn by the shooter; and Shelly Bresilla, who identified the jacket and cellular telephone as items that she had given to her brother as gifts.

During the trial, defense counsel learned that, just prior to trial, the prosecutor had conducted witness preparation

sessions with Bhatia, Mendes, and Vicini in which he showed each witness a photograph of the jacket found in the parking lot to determine whether they could still identify it.[1]  Defense counsel then moved to preclude the in-court identification of the jacket by Mendes and Vicini, arguing essentially that such testimony would be the product of a highly prejudicial showup photographic identification.  The prosecutor countered that he properly asked each witness if they recognized the jacket depicted on the photograph in the context of trial preparation.  The judge denied the defendant's motion, concluding there was no misconduct and no prejudice.

Also during the trial, defense counsel noticed discrepancies between the original eyewitness photographic identification forms regarding the defendant that were entered in evidence and the copies provided to the defendant in discovery.  Several of the originals apparently had been altered with "whiteout" and reflected new or different information. Defense counsel moved to dismiss the case on grounds of prosecutorial misconduct or, in the alternative, to stay the proceedings pending an investigation into the Cambridge police procedures used in building the case against the defendant.

---

[1] Defense counsel learned of this during the Commonwealth's direct examination of Fabio Mendes, which was prior to the testimony of Sonny Bhatia and David Vicini.

The judge held a midtrial, two-day evidentiary hearing outside the presence of the jury.  At the hearing, defense counsel extensively cross-examined Detective McNeil and Sergeant John Boyle, the officer who had been in charge of the investigation.  Each denied any knowledge regarding the modifications made to the witness identification forms, and the judge denied the defendant's motion.  At the conclusion of the trial, the defendant requested that the jury be given specific instructions regarding police misconduct and the fallibility of eyewitness identifications of physical evidence.  These requests were denied as well, although the judge did allow defense counsel to argue those points to the jury.  The judge also extensively instructed the jury regarding the factors that generally affect eyewitness identification testimony.  The jury found the defendant guilty of the firearm violation and murder in the first degree on a theory of premeditation.

d.  <u>Motion for a new trial</u>.  The defendant moved for a new trial on grounds that the Cambridge police failed to adhere to department protocols with respect to the photographic identifications and that the Commonwealth failed to timely disclose its pretrial jacket identification sessions, which, in any event, violated due process because the photograph of the jacket was presented alone rather than in an array of jacket photographs.

In light of the midtrial evidentiary hearing, the judge denied the defendant's motion without holding an additional hearing. The judge concluded that the procedural lapses of the Cambridge police with respect to filling out the eyewitness identification forms were minor, did not prejudice the defendant, and -- in one instance -- actually benefited him. Citing the Simmons case, she ruled that the witness preparation sessions did not violate due process and, further, that the amended through 442 Mass. 1518 (2004), did not apply to identifications of inanimate objects and, even if it did, the defendant was not prejudiced by any delay in the disclosure. On appeal, the defendant assigns error to various rulings related to the motions to suppress, evidentiary rulings at trial, the prosecutor's closing, the judge's jury instructions, and the denial of the motion for new trial. We affirm.

2. Discussion. "When this court reviews a defendant's appeal from the denial of a motion for a new trial in conjunction with his direct appeal from an underlying conviction of murder . . . , we review both under G. L. c. 278, § 33E." Commonwealth v. Burgos, 462 Mass. 53, 59, cert. denied, 133 S. Ct. 796 (2012).

a. The jacket identifications. The defendant argues that the admission of the jacket identifications violated due process and rule 14. In Simmons, 383 Mass. at 51, we observed that

although the principles applicable to pretrial identifications of suspects do not ordinarily extend to out-of-court identifications of inanimate objects, "in an extreme case, the degree of suggestiveness of an identification procedure concerning an inanimate object might rise to the level of a denial of due process."  The defendant contends that this is such a case.  We do not agree.

In the Simmons case, a rape victim had told the police "that her attacker's vehicle was 'a small vehicle, a Volkswagen-type of vehicle.'"  Id. at 49.  The Commonwealth was concerned that the victim would be unable to identify the defendant's vehicle, which was a Ford Mustang.  Id. at 47-49.  Prior to trial, the victim was escorted to and shown the vehicle by the police.  Id. at 47.  At trial, the victim described the perpetrator's vehicle as a Ford Mustang.  Id. at 49.  In concluding that the showup procedure employed by the police was not marked by fundamental unfairness, we noted that the evidence did not demonstrate that the victim had been contemporaneously instructed as to the ownership of the vehicle.  Id. at 53.

The jacket identifications in this case were significantly less suggestive than the automobile identification in the Simmons case.  First, the parking lot identifications of the jacket made by Bhatia and Mendes just after the shooting were critical to the ongoing police effort to apprehend an armed

murderer on the loose.  There can be no serious argument that, in such a situation, the police were required to present the witnesses with a jacket lineup.  Second, given that the trial did not take place until nearly four years after the shooting,[2] it was reasonable for the prosecutor, during trial preparation, to show Bhatia and Mendes a photograph and to inquire whether they would be able to make an in-court identification of the jacket that they had identified in the parking lot on the night of the murder.  It was also reasonable to ask Vicini whether he recognized the jacket in the photograph, where he had described it to police right after the shooting.

The defendant points out that, unlike in the Simmons case, it would not have been burdensome for the Commonwealth to arrange either a jacket lineup or a photographic array of jackets in advance of trial.  That may be so, but that is not the governing standard.  Our observation regarding the feasibility of an automobile lineup in the Simmons case was but one of several distinctions we drew between identifications of people and property.  Id. at 52.  The finer point was that, unlike people, tangible objects are typically not unique, and thus identifications of the latter provide only indirect

_____

[2] The delay is explained, in part, by the fact that the defendant was sent to Bridgewater State Hospital, apparently on two occasions, for evaluation of his competency to stand trial. See G. L. c. 123, § 15.

evidence of the defendant's guilt.  Id.  By comparison, the "chances of fundamental unfairness are greater in the former situation. Identification of a defendant directly tends to prove the case against him."  Id.

In this case -- and in sharp contrast to Detective Mahoney's inappropriate conduct in the hallway during the motion to suppress hearing -- the prosecutor simply showed a picture of the previously identified jacket to the witnesses and asked whether they recognized it.  We find nothing fundamentally unfair or suggestive about the procedures employed by either the police or the prosecutor with respect to the jacket.  As in the Simmons case, the Commonwealth was not required to create a photographic array of jackets as part of its preparation for trial.

The defendant posits that, even if the identifications themselves were not unduly suggestive, the Commonwealth's failure to disclose them violated the rule of Brady v. Maryland, 373 U.S. 83 (1963).  In that case, the United States Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  Id. at 87.  We have clarified that "[w]here such evidence is disclosed belatedly, 'it is the consequences of the delay that

matter, not the likely impact [of the evidence].'" Commonwealth v. Forte, 469 Mass. 469, 486 (2014), quoting Commonwealth v. Wilson, 381 Mass. 90, 114 (1980).  The threshold issue, however, is whether the evidence was in fact exculpatory.  See Commonwealth v. Williams, 455 Mass. 706, 714 (2010).

The defendant reasons that the trial testimony of Mendes and Vicini constituted exculpatory impeachment evidence because it was more damaging than their original statements to the police.  See Commonwealth v. Vieira, 401 Mass. 828, 832 (1988), quoting Commonwealth v. Ellison, 376 Mass. 1, 22 (1978) ("Although the evidence was more incriminating than the earlier statements, it was exculpatory in the sense that the variance with the previous statements permitted 'challenge[] [to] the credibility of a key prosecution witness'").  We are not persuaded.  Contrary to the defendant's recitation of the evidence, Mendes did identify the jacket in the video store parking lot as the one worn by the shooter.  Moreover, although Vicini had previously only described the jacket to the police, the defendant was on notice of the Commonwealth's intention to elicit a jacket identification from Vicini at trial.  However, even if the defendant were correct that the Commonwealth was obliged to disclose the pretrial photographic identification of the jacket, he was not prejudiced by the fact of the delay in that disclosure.

The defendant complains that he did not have the benefit of this "new" testimony when cross-examining Jacobs, Jeanne Pinette (an eyewitness), and Officer Janie Munroe (who found the jacket). Yet, if the exculpatory character of the testimony lay in its capacity to impeach its source, it is unclear how the defendant would have used that evidence effectively against Jacobs, Pinette, and Munroe. See Vieira, 401 Mass. at 832. In contrast, defense counsel was able to cross-examine Bhatia, Mendes, and Vicini -- the sources of the purportedly inconsistent testimony. See Commonwealth v. Gilbert, 377 Mass. 887, 895 (1979) ("As to the problem of preparation, the cross-examination of [the witness] was not only extended but searching, and we do not think it would have been materially improved by earlier warning about the witness's departure from the written statement"). There is no apparent basis to conclude that a restructured cross-examination of any of the witnesses -- based on an earlier disclosure -- would have "create[d] a reasonable doubt that would not otherwise have existed." Commonwealth v. St. Germain, 381 Mass. 256, 263 (1980), quoting Wilson, 381 Mass. at 114. The defendant also makes much of the varying descriptions of the jacket that were relayed to the jury. Yet, any such inconsistencies go to weight rather than its admissibility. See Simmons, 383 Mass. at 50-51. There was no due process violation.

In addition, the trial judge correctly determined that any nondisclosure was not in bad faith. "When the ground for a continuance or exclusion of evidence involves late disclosure by the prosecution, without any showing of bad faith on its part (as is the case here), a defendant is required to show material prejudice from the disclosure before a new trial can be considered." Commonwealth v. Hamilton, 426 Mass. 67, 70 (1997). Defense counsel was able to cross-examine vigorously Bhatia, Mendes, and Vicini regarding the pretrial jacket identification procedures. The photograph was not presented to any of the three in an unduly suggestive manner and, therefore, there was little risk that the in-court identifications were premised on the witness preparation session rather than the witnesses' memories of what they had observed on the night of the shooting. Contrast Commonwealth v. Jones, 423 Mass. 99, 105 (1996) ("We too reject the Commonwealth's argument that the evidence was clear and convincing that [the witness's] in-court identification had a source independent of what the Commonwealth implicitly concedes were two highly suggestive pretrial encounters"). Consequently, the delay did not affect materially the jury's consideration of the evidence or the defendant's ability to challenge that evidence.

b. The photographic arrays. The defendant also assigns error to the admission of the photographic arrays conducted with

Dabady, Mathurin, Mendes, and Bhatia.[3] The judge acting on the motion to suppress "articulated the correct standard, placing on the defendant the burden of proving that the identification procedures were '"so unnecessarily suggestive and conducive to irreparable mistaken identification" as to deny the defendant due process of law.'" Commonwealth v. Echavarria, 428 Mass. 593, 596 (1998), quoting Commonwealth v. Venios, 378 Mass. 24, 27 (1979). Based on the state of the evidence at that juncture, her findings of fact were accurate and her conclusions of law were sound.

Over the course of the trial, additional facts came to light, specifically the modifications to the identification forms that appeared after the motion to suppress hearing, where defense counsel pointed out several mistakes that had been made in filling them out. Yet, whether these modifications were a result of mere sloppiness or affirmative misconduct, they did not affect the conditions under which the photographic arrays were conducted. The judge had discretion in fashioning a remedy, which she exercised by permitting defense counsel to extensively cross-examine the officers regarding the changes. See, e.g., Commonwealth v. Hine, 393 Mass. 564, 573 (1984) (remedy for police misconduct should be tailored to cure

---

[3] The motion judge ordered that Bhatia was not permitted to identify the defendant or any of the photographs he picked out of the photographic array during his trial testimony.

prejudice to defendant); Commonwealth v. Williams, 6 Mass. App. Ct. 923, 924 (1978) (remedy for police misconduct committed to discretion of trial judge). In so doing, defense counsel cast considerable doubt over the thoroughness and integrity of the police investigation and eliminated any prejudice inuring to the defendant by way of the modifications.[4]

In his motion for new trial, the defendant buttressed his initial suppression arguments with the additional irregularities uncovered at trial. The motion judge, who was also the trial judge, determined that any error did not prejudice the defendant. Several of the changes, such as the addition of file numbers and the name of the person who composed the arrays, were completely innocuous. Moreover, the modification to the identification form signed by Mendes benefited the defendant by more overtly indicating that Mendes was unable to identify the perpetrator. Although it is accurate to say that the police officers who presented the photographic arrays failed to indicate on the form which advisements were given to each witness, it is also accurate that the evidence at trial plainly established that each witness was read the full menu of advisements and was asked to state how certain he was of the

---

[4] The changes were not even remotely inculpatory, but, because they existed, defense counsel was able to use them largely to his advantage.

identification.  See Commonwealth v. Silva-Santiago, 453 Mass. 782, 798 (2009).

The fact that Dabady and Mathurin already knew the defendant at the time they made the photographic identifications of him, and that that information was not written on the identification forms, lacks constitutional significance.  See, e.g., Commonwealth v. Carr, 464 Mass. 855, 871 (2013) ("witnesses knew the defendant from the neighborhood and witnessed the shooting in broad daylight; it is unlikely that suggestiveness would have played much of a role in their identifications").  Although the one-month delay in the Mathurin array was not ideal, it was not so lengthy as to render the identification procedure unduly suggestive.  See, e.g., Commonwealth v. Funderberg, 374 Mass. 577, 582 (1978) (two-month lapse not suggestive).  Further, Detective McNeil's continued status as a blind presenter following the photographic identification made by Dabady was "properly a matter of the weight of the identification evidence . . . rather than of admissibility."  Silva-Santiago, 453 Mass. at 797.[5]  Looking at the evidence as a whole, we conclude that the defendant was not

---

[5] Moreover, whatever the slight effect Detective McNeil's errant remark of "that's good" (made after Mendes selected a photograph) had on the suggestiveness of the array, its force was blunted by Mendes's failure to make a positive identification.

deprived of due process by the manner in which the photographic identifications of him were made.

c. The showup. The defendant next renews his claim of error with respect to the showup identification of Jacobs. "We have repeatedly held that, although inherently suggestive, one-on-one confrontations in the immediate aftermath of a crime need not be suppressed." Commonwealth v. Walker, 421 Mass. 90, 95 (1995). Such one-on-one identification procedures will pass muster so long as there was "good reason" for the police to employ them. Commonwealth v. Austin, 421 Mass. 357, 361 (1995). "Relevant to the good reason examination are the nature of the crime involved and corresponding concerns for public safety; the need for efficient police investigation in the immediate aftermath of a crime; and the usefulness of prompt confirmation of the accuracy of investigatory information, which, if in error, will release the police quickly to follow another track." Id. at 362.

The crime involved in this case was homicide -- potentially murder -- by means of a semiautomatic firearm fired in the midst of a crowd of people. The police had not located the firearm and the perpetrator was still at large, late at night, in a densely populated city. Within less than one hour, the police had located a suspect who roughly matched the descriptions supplied by witnesses, as well as a witness who claimed he could

recognize the shooter if given the opportunity. It is difficult to imagine a scenario presenting a more compelling reason to conduct a showup procedure.

The defendant acknowledges the exigency of the situation, but asserts that the showup was conducted in an unnecessarily suggestive manner. The defendant identifies Jacobs as the primary source of this suggestiveness. "The question raised by a motion to suppress identification testimony," however, "is not whether the witness might have been mistaken, but whether any possible mistake was the product of improper suggestions by the police." Commonwealth v. Watson, 455 Mass. 246, 251 (2009). In Commonwealth v. Phillips, 452 Mass. 617, 628 (2008), we held that the "facts that [the defendant] had been detained in a police wagon, was handcuffed, and was flanked by two police officers during the investigation did not render the procedure unnecessarily suggestive."

Here, at the time of the showup, the defendant stood in the fresh air with his hands behind his back and, although there were police officers nearby, the defendant did not appear to be detained. The circumstances of the showup in this case were less suggestive than the circumstances in the Phillips case. See id.; see also Commonwealth v. Figueroa, 468 Mass. 204, 218 (2014). Jacobs may or may not have been a reliable witness, but that was a question for the jury, who were thoroughly instructed

on the subject by the trial judge. See Commonwealth v. Francis, 390 Mass. 89, 100-101 (1983). Detective McHale had to make a judgment call in the face of an ongoing threat to public safety, and we find no error in his exercise of that judgment. He gave Jacobs all of the advisements, confirmed that he understood them, and then recorded all of the information required by the showup identification form. See Silva-Santiago, 453 Mass. at 798. The showup procedure was valid.

d. The challenged testimony. The defendant next contends that the admission of prejudicial testimony of two of the Commonwealth's witnesses constituted reversible error. Specifically, he casts "Sergeant [Edward J.] Frammartino's testimony about white, frothy sputum coming out of (the victim's) mouth and all over the place, and the chemist's extensive and illustrated testimony about the blood-stained pink shirt," as appealing to the sympathies of the jury.[6] Because this testimony was not relevant to the identity of the shooter, the defendant contends that his objection at trial should have been sustained.

"Evidence is relevant if it has a rational tendency to prove a material issue." Commonwealth v. Dunn, 407 Mass. 798, 807 (1990). "The weighing of the prejudicial effect and

---

[6] The defendant does not appeal the admission in evidence of the bloody shirt, which exhibited fourteen holes, or the photographs of that bloody shirt.

probative value of evidence is within the sound discretion of the trial judge, the exercise of which we will not overturn unless we find palpable error." Commonwealth v. Bonds, 445 Mass. 821, 831 (2006). The boundaries of relevance are not defined solely by the defendant's theory of the case. In other words, the defendant's misidentification theory did not relieve the Commonwealth of its burden of proving each element of its prima facie case of murder in the first degree. See Commonwealth v. Fitzgerald, 380 Mass. 840, 841-842 (1980) ("It is incontrovertible that the burden is on the Commonwealth to prove or disprove beyond a reasonable doubt each of the elements constituting the crime of murder that were in issue in this case").

In order to meet its burden with respect to the theory of extreme atrocity or cruelty, the Commonwealth's "evidence [had to] be of such a character as to show that the crime was committed under circumstances indicating something more than ordinary atrocity or cruelty, and manifesting a degree of atrocity or cruelty which must be considered as aggravated and extreme." Commonwealth v. Knowlton, 265 Mass. 382, 388 (1928). In evaluating whether the Commonwealth met that standard, the jury were permitted to consider:

> "the defendant's indifference to or pleasure in the victim's suffering, the victim's consciousness and degree of suffering, the extent of injuries inflicted, the number

of blows, the manner and force by which the blows were delivered, the weapon used by the defendant, and the disproportion between the means necessary to cause death and the means employed."

Commonwealth v. Semedo, 422 Mass. 716, 721 (1996), citing Commonwealth v. Cunneen, 389 Mass. 216, 227 (1983).  Evidence probative of extreme atrocity or cruelty will often be gruesome, but that fact alone is insufficient to render the evidence inadmissible.  Commonwealth v. Ramos, 406 Mass. 397, 406-407 (1990).

Sergeant Frammartino's testimony regarding the white, frothy sputum and breathing difficulties of the victim as he lay dying was relevant to consciousness and degree of suffering.  See Semedo, 422 Mass. at 721.  The chemist's testimony regarding the photographs clarified which of the fourteen holes in the shirt were consistent with the travel of bullets, which was relevant to the extent of the injuries, the number of blows, and the weapon used to inflict them.  See id.  The judge did not abuse her discretion in determining that the relevance of each witness's testimony was not outweighed by its prejudicial effect.  Cf. Commonwealth v. Campbell, 375 Mass. 308, 313-314 (1978) (no error in admission of both photographic and verbal testimony illustrating nature of murder victim's wound).

e.  The prosecutor's closing argument.  The defendant also challenges two aspects of the Commonwealth's closing argument.

First, he accuses the prosecutor of improperly speculating that the "defendant wasn't alone that night. He was talking to friends. Don't you think that's who he ditched the gun -- or, handed the gun off to?" Second, he contends that the prosecutor shifted the burden of proof by commenting on the defendant's unhelpfulness during the police investigation. Because defense counsel objected to both of the challenged remarks at trial, we review for prejudicial error. Commonwealth v. Santiago, 425 Mass. 491, 500 (1997), S.C., 427 Mass 298 (1998), and 428 Mass. 39 (1998), cert. denied, 525 U.S. 1003 (1998). "The cumulative effect of all the errors in the context of the entire argument and the case as a whole is considered in making this determination." Id.

"The rules governing prosecutors' closing arguments are clear in principle." Commonwealth v. Kozec, 399 Mass. 514, 516 (1987). Prosecutors may not refer to facts not in evidence or make statements that shift the burden of proof to the defendant. Commonwealth v. Amirault, 404 Mass. 221, 238-240 (1989). "A prosecutor may, however, in closing argument, analyze the evidence and suggest what reasonable inferences the jury should draw from that evidence." Commonwealth v. Grimshaw, 412 Mass. 505, 509 (1992). Because the line separating speculation and inference is often a fine one, "we must and do recognize that closing argument is identified as argument, the jury

understand[] that, instructions from the judge inform the jury that closing argument is not evidence, and instructions may mitigate any prejudice in the final argument." Kozec, 399 Mass. at 517.

The prosecutor was entitled to offer a response to defense counsel's closing argument regarding the failure by police to locate the gun. See Commonwealth v. LeFave, 407 Mass. 927, 939 (1990) (prosecutor has right of retaliatory reply). As there was no direct evidence that the defendant "ditched the gun," the prosecutor asked the jury to draw an inference based on the following facts that were in evidence: (1) the police were unable to locate the gun; (2) when asked about the location of the gun, the defendant indicated that the police would not find it; (3) the defendant discarded articles of his clothing in the aftermath of the shooting; and (4) the defendant told the police that he was with his friends outside the night club at the time of the shooting. In light of these facts, as well as the substantial evidence that the defendant was the shooter, the jury were permitted to infer that the defendant handed the gun off to a friend.

The prosecutor was also entitled to respond to defense counsel's criticism of the police investigation, which characterized the police as more interested in building a case against the defendant than in finding the actual perpetrator.

See LeFave, 407 Mass. at 939.  The defendant told the police that he was with his friends outside the night club at the time of the shooting.  In express rebuttal to defense counsel's charge, the prosecutor recounted the Cambridge police department's unsuccessful attempts to contact these friends to confirm the defendant's alibi.  The defendant contends that this "signal[ed] to the jury that the defendant ha[d] an affirmative duty to bring forth evidence of his innocence." Commonwealth v. Tu Trinh, 458 Mass. 776, 787 (2011).  We disagree.

The cases cited by the defendant are not on point.  In Commonwealth v. Buzzell, 53 Mass. App. Ct. 362, 370 (2001), the prosecutor observed to the jury that defense counsel had failed to offer an explanation for the "uncontested" evidence against the defendant.  As we explained in Commonwealth v. Borodine, 371 Mass. 1, 10 (1976), cert. denied, 429 U.S. 1049 (1977): "References to certain facts as 'uncontested' are improper when the defendant himself is the only one who can contradict the evidence."  In Tu Trinh, 458 Mass. at 788, the prosecutor opined to the jury that "to come in here and point the finger at the Boston police department because it's easy to do is just not fair and it's not right."  This constituted improper argument because it suggested that defense counsel's strategy was inappropriate.  We held that the trial judge mitigated any prejudice by instructing the jury that "[w]hat [the prosecutor]

meant to say . . . was, in his view, based on the state of the evidence and the circumstances of this case[,] that it was unwarranted, not that it was not right or unfair." Id. at 789 & n.21.

By comparison, the prosecutor in this case did not comment on the defendant's failure to contradict "uncontested" evidence, nor did he imply that it was improper for defense counsel to attack the thoroughness of the police investigation.  Rather, he argued that defense counsel's assertion was not supported by the evidence.  This was permissible.  Viewing the prosecutor's statements in context, there is no basis to conclude that the burden of proof was shifted from the Commonwealth to the defendant.

f.  The requested jury instructions.  The defendant argues that the judge erred in denying three requested jury instructions.  We find no error.  Two of the requested instructions, which the defendant captions "Omissions in Police Investigations" and "Missing or Tampered with Evidence," were intended to address certain purported failures or inadequacies in the police investigation.  These requested instructions are accurately characterized as a so-called Bowden instruction.  See Commonwealth v. Tolan, 453 Mass. 634, 652 (2009) ("[Commonwealth v Bowden, 379 Mass. 472, 486 (1980)] instruction permits jurors

to consider evidence . . . of police failure to take certain investigatory steps").

On a number of occasions, we have said that the Bowden instruction may be given in the judge's discretion, but it is never required. See e.g., Commonwealth v. Fitzpatrick, 463 Mass. 581, 598 (2012), quoting Commonwealth v. Williams, 439 Mass. 678, 687 (2003) ("such an instruction is 'never required under our case law'"); Commonwealth v. Perez, 460 Mass. 683, 692 (2011), quoting Williams, 439 Mass. at 687 ("as we have often stated, 'a judge is not required to instruct on the claimed inadequacy of a police investigation'"). All Bowden requires, we have said, is that the judge not remove from the jury's consideration the issue of claimed failure or inadequacy. Fitzpatrick, 463 Mass. at 598.

Here, the judge did not prevent defense counsel from arguing the inadequacies of the police investigation to the jury. Indeed, defense counsel took full advantage of the opportunity. The issue was properly before the jury, and the judge's instructions provided a sufficient legal framework for the jury to weigh the evidence and determine the credibility of each witness. There was no abuse of discretion. Perez, 460 Mass. at 692.

The defendant captions the third requested instruction, "Identification of Physical Evidence." He contends that this

instruction anticipated our holding in Commonwealth v. Franklin, 465 Mass. 895, 912 (2013), that, when requested, a "variation of the approved identification instruction" should be given where "eyewitnesses have provided a physical description of the perpetrator or his clothing." Id. The new rule articulated in the Franklin case arose in the context of our observation "that eyewitness identification may be an important issue at trial even where no eyewitness made a positive identification of the defendant as the perpetrator, but where eyewitnesses have provided a physical description of the perpetrator or his clothing." Id. Nonetheless, we concluded that the "absence of a specific identification instruction was not likely to have influenced the jury's verdicts and, therefore, did not result in a substantial likelihood of a miscarriage of justice." Id. at 914.

The defendant does not directly argue that the Franklin case should be applied retroactively, and we need not reach that issue, as the defendant suffered no prejudice from the omission. See Commonwealth v. Dyous, 436 Mass. 719, 730 (2002). The trial judge instructed the jury extensively regarding eyewitness identification testimony. The instruction covered numerous factors to consider when evaluating such testimony, including lighting, distance, whether the witness had seen or known the person in the past, the witness's capacity and opportunity to

make the observation, and the length of time between the observation and the testimony.  Although the judge did not assign explicitly this framework to identifications of physical evidence, the concepts were transferable readily.

Moreover, defense counsel was permitted to argue this very point during his closing argument and, in fact, did so extensively.  In light of defense counsel's vigorous argument, the court's instructions on eyewitness identification testimony, and the strong evidence implicating the defendant as the shooter, we conclude that the absence of the modified instruction "did not influence the jury, or had but very slight effect."  Commonwealth v. Gambora, 457 Mass. 715, 729 (2010), quoting Commonwealth v. Flebotte, 417 Mass. 348, 353 (1994).

g.  The motion for a new trial.  The defendant's final argument is that he was erroneously deprived of an evidentiary hearing in connection with his motion for a new motion.  "The decision to hold an evidentiary hearing on a motion for a new trial is a matter committed to the sound discretion of the trial judge."  Commonwealth v. Britto, 433 Mass. 596, 608 (2001).  A "judge may rule on the issue or issues presented by such motion on the basis of the facts alleged in the affidavits without further hearing if no substantial issue is raised by the motion or affidavits."  Mass. R. Crim. P. 30 (c) (3), as appearing in 435 Mass. 1501 (2001).  "In determining whether a 'substantial

issue' meriting an evidentiary hearing under rule 30 has been raised, we look not only at the seriousness of the issue asserted, but also to the adequacy of the defendant's showing on the issue raised." Commonwealth v. Stewart, 383 Mass. 253, 257-258 (1981).

The issues raised by the defendant's motion and the accompanying affidavit of trial counsel were the pretrial jacket identifications, the protocol lapses by the Cambridge police, and the altered identification forms. Those issues were thoroughly explored through evidentiary hearings both prior to and during the trial. The judge did not abuse her discretion in concluding that an additional hearing would have been cumulative and unnecessary. Britto, 433 Mass. at 608.

h. G. L. c. 278, § 33E. We have reviewed the record in accordance with G. L. c. 278, § 33E, to determine whether there is any basis to set aside or reduce the verdict of murder in the first degree or to order a new trial, regardless of whether such grounds were raised on appeal. During that review, we encountered questionable actions by the police,[7] and several

---

[7] As indicated above, we conclude that the various lapses in protocol and judgment by the Cambridge police department in this case were appropriately addressed at each stage of the proceedings below.

erroneous evidentiary rulings.[8]  We conclude, however, that these errors did not give rise to a substantial likelihood of a miscarriage of justice.  Accordingly, we decline to exercise our authority under § 33E to order a new trial or reduce the degree of guilt.

<u>Judgments affirmed</u>.

---

[8] One of these rulings pertained to the identification testimony of Daniel Jacobs.  The trial judge entirely precluded defense counsel from using Jacobs's medical records to impeach the credibility of his observations on the night of the shooting.  Just six weeks prior to the shooting, Jacobs had been admitted to a hospital specializing in the treatment of psychiatric illness and chemical dependency.  The hospital records reveal a history of bipolar disorder and poly-substance abuse.  During his stay, Jacobs also complained of intermittent blurred vision, exhibited inconsistent memory, and engaged in unstable behavior that resulted in his being chemically restrained on two occasions.  Given the temporal proximity of Jacobs's stay to the night in question, the records may very well have cast doubt among the jury regarding Jacobs's ability to accurately perceive and describe the events he allegedly witnessed on the night of the shooting.  <u>Commonwealth</u> v. <u>Caine</u>, 366 Mass. 366, 369 (1974) ("mental impairment, as well as habitual intoxication and drug addiction, may be the subject of proper impeachment if it is shown that such factors affect the witness's capacity to perceive, remember, and articulate correctly").  Therefore, we disagree with the judge's conclusion that the records were not relevant.

Nevertheless, this error does not require reversal because defense counsel was permitted and able to broadly and effectively impeach Jacobs's credibility.  On cross-examination, Jacobs admitted to prior convictions for drug possession, to having substance abuse problems, to drinking on the night of the shooting, to misremembering the date and time of his arrival at the night club, and to many inconsistencies between his trial testimony and grand jury testimony.  Moreover, given the strength of the Commonwealth's other evidence, we conclude that the additional, disallowed source of impeachment could not have affected the jury's decision.  See <u>Commonwealth</u> v. <u>Morales</u>, 461 Mass. 765, 784-785 (2012).

<u>Order denying motion for new trial affirmed</u>.