SUPERIOR COURT 
 
 COMMONWEALTH v. JOSE PINERO

 
 Docket:
 2284CR00776
 
 
 Dates:
 William F. Bloomer Justice of the Superior Court
 
 
 Present:
 July 16, 2024
 
 
 County:
 SUFFOLK
 

 
 Keywords:
 MEMORANDUM OF DECISION AND ORDER ON DEFENDANT'S MOTION TO SUPPRESS IDENTIFICATION (Paper No. 35)
 
 

             The defendant, Jose Pinero ("Pinero"), moves to suppress an out-of-court photographic array and any in-court identifications made of him by a Commonwealth witness, Kevin Ramsey (" Ramsey"). following a hearing, and for the reasons set forth below, Pinero's motion to
suppress identification is DENIED.
FINDINGS OF FACT
            On June 6, 2024, the court heard testimony from Boston Police Department (" BPD") Detective Robert Lundbohm ("Lundbohm") and Dr. John Bulevich, Ph.D. ("Dr. Bulevich"), and received six exhibits in evidence. Pinero did not testify. The court makes the following factual findings based on the credible evidence produced at the hearing and the reasonable inferences drawn from the evidence. In making these findings, the court finds the testimony of Lundbohm and Bulevich truthful and accurate on the relevant and material points set forth below.
            On July 4, 2022, Boston Police responded to a report of shots fired in the vicinity of 37 Monsignor Reynolds Way. The address is part of a housing complex located across the street from the police department. Ramsey' s nephew suffered a hand injury as a result of the shooting.
 
                                                            -1-
 
            Lundbohm , who worked the 8:00AM to 4:00PM shift, spoke to the responding officers and interviewed witnesses upon reporting for his shift on July 4th. Ramsey informed Lundbohm that he believed his apartment was the intended target of gunfire. He stated that several of his friends and family members were celebrating the holiday outside the building in the early morning hours when gunshots rang out. Ramsey observed a group of individuals running from the direction where the gunshots originated towards 21 Monsignor Reynolds Way. He informed police this was not the first incident of gunfire directed at his family and that a specific group of people within the housing development were giving him and his son problems the past couple of years. Ramsey described another incident occurring approximately one week earlier on June 25, 2022. Ramsey believed the same group of individuals was responsible for both incidents.
            Ramsey spoke to investigators more than once following the shooting on July 4, 2022. During one of these exchanges, Ramsey informed Lundbohm that he had been having problems with an individual known to him as "Jose" from 21 Monsignor Reynolds Way. Ramsey knew Jose's family, who lived in the same housing development. Ramsey told investigators he believed Jose was involved in the shooting. Ramsey described Jose as a darker skinned Hispanic male in his early twenties with dreadlocks. Ramsey also believed that another individual known to him only as "Ant" belonged to the group giving him problems and that Ant was involved in the shooting on July 4th. He described Ant as heavier set and lighter skinned.[1]
            Based on the information provided by Ramsey, Lundbohm performed a search of 13PD's databases and determined that Pinero resided at 21 Monsignor Reynolds Way. Lundbohm also learned that, in June 2022, Boston Police officers responded to a report of a domestic incident at 21 Monsignor Reynolds Way allegedly involving Pinero. Lundbohm then prepared a photo
 
--------------------------------------------
 
[1] Ramsey apparently told one of the initial responding officers that two light-skinned Hispanic males were involved in the shooting, but later gave officers a more robust description of"Jose."
 
                                                            -2-
 
array which consisted of eight separate photographs and included the booking photograph of Pinero. See Ex. 3 (black and white photo array with Silva-Santiago instruction signed by Ramsey) and Ex. 5 (photo array with colored photographs). Pinero is depicted in photo number 3.
            Lundbohm explained how BPD investigators create photo arrays in general, a process followed in this case. Once a suspect is identified, Lunbohm explained, a search is performed of the BPD's booking system to determine whether the suspect, here Pinero, had previously been arrested by Boston Police. In this instance, Pinero had. Lundbohm obtained the most recent booking photo for Pinero from BPD's booking database and confirmed that the defendant matched the description provided by Ramsey. Once Lundbohm confirmed that Pinero was in BPD's booking system and matched Ramsey's description, the booking system itself populates a photographic array based on the biographic and physical information already in the database. In effect, the system prepopulates a photo array of individuals roughly matching Pinero's height, weight, age, skin complexion, hair style, body type, and other physical attributes. If an insufficient number of fillers results, the search parameters can be adjusted to capture more
individuals who resemble the suspect.[2]
            Lundbohm further explained that photographs included in BPD's photo arrays are generated solely from photos contained in BPD's internal booking system , which also includes booking information for arrests made by the Transit Police. Lundbohm has the ability to request that other departments outside of Boston generate a photo array for a BPD investigation, but this is done only when there is no booking photograph in BPD's system and the suspect has been arrested outside Boston. Lundbohm testified that he made such a request only once during his
 
--------------------------------------------
 
[2] For example, the template allows officers to make adjustments for age, which officers can expand from plus or minus three years to plus or minus five years or greater.
                                                            -3-
 
nineteen-year career. On that occasion, there was no booking photograph of the suspect in Lundbohm's investigation in BPD's booking system.
            The sequential identification procedure here was audio and video recorded. See Ex. 1. When shown the photo array in this case, Ramsey identified four individuals he recognized as part of the group who had given him and his family problems over the past two years. See Ex. 2, photo #1, #4, #6, and #8. He also identified Pinero as the person he believed was involved in the shooting. Ex. 2 photo #3. When shown the defendant' s picture, Ramsey stated, " Yeah, this is fucking definitely yes ... that's his whole face. I know who that is ... that's Vasatoni' s son. Yup. He be there too." Ramsey later told police that the previous Saturday [June 25, 2022], Jose was "the motherfucker that pointed - I was standing in my window, and I watched him point like that. And (indiscernible) I ran in the hallway. I watched him point the firearm at my fucking window and door."
            Dr. Bulevich testified on behalf of Pinero. Dr. Bulevich is a professor at Stockton University. See Ex. 6 (CV of Dr. Bulevich). He obtained his Ph.D. from Washington University in 2007. He has extensive research and teaching experience in the field of human memory, perception, and cognition. Dr. Bulevich has published a number of articles addressing issues associated with eyewitness identifications. He is also a member of a committee that reviews peer works for publication and attends and conducts national trainings addressing, among other things, human memory and eyewitness identifications.
            Dr. Bulevich explained there are three stages associated with the "process model" of how human memory works: (1) encoding, (2) storage, and (3) retrieval. first, the encoding process involves directing one' s attention to aspects of an event and processing the information received. Second, the encoded information is then stored, typically in long-term memory. Third, the
 
                                                            -4-
 
encoded information is then extracted from long-term memory. Dr. Bulevich further explained there are two primary divisions in long-term memory: episodic and semantic. Episodic memory refers to event-specific information, which also involves the retrieval of contextual information, that is, the information surrounding a particular event or situation. Semantic memory refers to knowledge of basic facts, such as the meaning of words or how mathematics work. Dr. I3ulevich explained that errors in memory can occur at all three stages. For example, episodic memory always has context. It involves "reassembling" various bits of information associated with a situation to form one whole memory. One can "reassemble" the pieces of information incorrectly. Dr. Bulevich explained that eyewitness memory is a form of episodic memory, involving the reassembling of information related to a specific individual within a specific context.
            Dr. Bulevich testified there are two broad classifications of variables affecting eyewitness identifications. One is a "system variable," which involves factors that can be controlled by individuals working in the legal system, such as the method used to conduct a lineup. The other is an "estimator variable," which involves factors that can affect eyewitness memory but over which there is no control by law enforcement. Examples of estimator variables include cross- racial crimes or the use of a weapon during the commission of a crime. Dr. I3ulevich explain ed that people of one race are more accurate at identifying an individual of the same race than of a different race. He also explained the concept of the " weapon focus effect," which involves an eyewitness giving a disproportionate amount of attention to a weapon during a crime at the cost of focusing on other factors during the event. Dr. Bulevich testified  that, in general, eyewitnesses make a lot more errors than they realize.
 
                                                            -5-
 
            With respect to photo arrays, Dr. Bulevich noted that the research on the topic generally addresses individuals viewing between six and eight photographs, one of which depicts the person of interest. This procedure, as Dr. Bulevich explained, involves the eyewitness discriminating between one individual and others who are perceptually similar as depicted in the photographs. He testified that, in his opinion, there is always an element of chance involved in this type of identification procedure.3 In an array consisting of eight photographs, Dr. Bulevich explained that if the eyewitness were to close their eyes and point to a photograph, there is a 12.5% chance of witness randomly selecting the suspect's photograph. Dr. Bulevich explained that the ability of the witness to select a photograph is dependent on a number of factors, including whether the eyewitness is familiar with the person of interest. If there were only four individuals in a lineup, he testified, then there is a 25% chance of the eyewitness randomly selecting the suspect. If there are three " non-suspects" in a photo array that the eyewitness knows and can recognize, Dr. Bulevich testified, then those three non-suspects can be eliminated from the witness's possible set of choices. Thus, in such a situation, the "chance" factor for choosing the wrong person is increased and there is a higher probability of the eyewitness making an error.
            In preparing to testify, Dr. Bulevich reviewed the police reports and grand jury minutes in this case. He "probably" reviewed the photo array in this case but did not review the recorded identification procedure with Ramsey. He offered no opinion with respect to this specific case. Dr. Bulevich testified, "You can never make a specific prediction as to any one individual's memory performance," and that he always speaks in terms of what is statistically more or less likely to occur.
 
--------------------------------------------
 
[3] Dr. Bulevich's opinion rests on the presumption that the eyewitness in fact selects a photograph.
 
                                                            -6-
 
            Additional factual findings are integrated in the following conclusions of law.
CONCLUSIONS  OF LAW
            Admission into evidence of an identification that was the product of an unnecessarily suggestive procedure violates a defendant's right to due process guaranteed by the fourteenth Amendment to the United States Constitution and Article 12 of the Massachusetts Declaration of Rights. See Commonwealth v. Johnson, 473 Mass. 594,597 (2016). "To succeed in suppressing evidence of such an identification, however, the defendant must prove by a preponderance of the evidence that the police procedure was 'so unnecessarily suggestive and conducive to irreparable mistaken identification as to deny [the defendant] due process of law."' Commonwealth v. Dew, 478 Mass. 304, 306-307 (2017). When this burden is met, the out-of-court  identification is per se excluded as a violation of a defendant's due process right under art. 12. Commonwealth v. Johnson, 420 Mass. 458, 462-463 (1995).[4] "The crucial question is whether any possible mistaken identification is due to improperly suggestive procedures by the police." Commonwealth v. Colon-Cruz, 408 Mass. 533, 541 (1990). In considering whether evidence obtained from the identification process should be suppressed, the judge must examine "the totality of the circumstances attending the confrontation to determine whether it was unnecessarily suggestive." Commonwealth v. Silva-Santiago, 453 Mass. 782, 794-795 (2009).
            Here, the identification procedure was audio and video recorded. Sec Ex. 1 (recording beginning at 11:21:05). Ramsey immediately identified Pinero from photograph #3 as depicting the individual who he knew as "Jose" and who he believed was involved in the shooting.
 
--------------------------------------------
 
[4] Because the standard for admissibility of an identification under the Massachusetts Constitution is more favorable to a defendant than the standard under the United States Constitution, this court need not consider any Federal constitutional claims. Commonwealth v. Galipeau, 93 Mass. App. Ct. 225, 227 n.3 (2018).
 
                                                            -7-
 
Ramsey also identified four individuals from the array that he recognized as part of the group who were responsible for giving him and his family members problems over the past two years.[5]
            Considering the totality of the circumstances attendant to Ramsey' s identification, the court concludes Pinero has failed to meet his burden under art. 12 to show that the identification procedure employed here was so unnecessarily suggestive and conducive to irreparable mistaken identification that it denied Pinero due process of law. Turning to the factors set forth in the Massachusetts Guide to Evidence § 1112(b)(I )(8), police employed a "double-blind," sequential identification procedure, which included the Silva-Santiago instruction. Ramsey acknowledged verbally and in writing that he understood the protocol before viewing the photo array. The array itself consisted of Pinero's photograph and seven fillers. There is nothing unnecessarily suggestive about the photographs themselves, which depict males who "possess reasonably similar features and characteristics" to that of the defendant. Mass Guide Evid. § 1112(b)(I)(B)(iii). In addition, nothing the police did during their presentation of the photographs to Ramsey made the identification procedure unnecessarily suggestive. The officer overseeing the process made no suggestive comments prior to or during the identification procedure. Ramsey immediately identified Pinero as "Vasatoni's son," a resident of the same housing complex, who had pointed a gun at him one week before.
            Pinero nevertheless argues that there were special elements of unfairness associated with the identification procedure. Specifically, Pinero argues that the police sought to "stack the deck" against him by including photographs of non-suspects who were known to Ramsey, thus
 
--------------------------------------------
 
[5] While looking at photograph 118, Ramsey commented, "These are old pictures of them. They don't really look like this no more." See Ex. 2 (Transcript at* 1-21). After pausing, Ramsey initialed photo 118 and acknowledged that the person depicted in photo #8 was one of the group of persons giving him and his family members problems.
 
                                                            -8-
 
increasing the likelihood Ramsey would identify him as the shooter from the photo array in a manner consistent with Dr. Bulevich's testimony.
            The Supreme Judicial Court has held that "a showup identification is unnecessarily suggestive if the procedure utilized by the police includes ' special elements of unfairness."' Commonwealth v. German, 483 Mass. 553, 558 (2019) (emphasis added). "Under art. 12, '[e]ven where there is a good reason to conduct a one-on-one identification procedure, the evidence must be excluded if there are special elements of unfairness, indicating a desire on the part of the police to stack the deck against the defendant."' Id. at 559. See Commonwealth v. Leaster, 395 Mass. 96, 103 (1985) (even where show-up occurs promptly after crime, "if there are special elements of unfairness, indicating a desire on the part of the police to 'stack the deck' against the defendant, an identification resulting from such a confrontation would be inadmissible"). Police did not employ a one-on-one identification procedure in this case.[6]
            Moeover, even assuming the "special elements of unfairness" analysis applies with equal force to a photo array identification, Pinero's argument must fail after an evaluation of the totality of the circumstances in this case. There is no evidence before the court that Lundbohm either knowingly or intentionally included photographs of non-suspect individuals who were known to Ramsey in the array. The opposite is true. Here, the booking system automatically generated a photo array of individuals who had similar physical features and attributes to Pinero. Lundbohm took precautions to exclude photographs of two other individuals who associated with the defendant and were known to Ramsey, including "Ant," from the array.[7] Lundbohm
 
--------------------------------------------
 
[6] Commonwealth v. /Jresi/la, 470 Mass. 422(2015), relied upon by Pinero, is inapposite. Unlike Bresilla, police here did not engage in inappropriate conduct or orchestrate a one-on-one identification procedure.
[7] Lunbohm testified to another shooting in 2021 that occurred at the Monsignor Reynolds Way housing complex. The photograph of the suspect in that shooting, which involved a separate investigation by another detective, was not included in the photo array shown to Ramsey in this case.
 
                                                            -9-
 
testified that, aside from the photograph of Pinero, he had no idea whose photographs were included in the array. He did not recognize any of the non-suspect individuals included in the array as persons who were associated with the Monsignor Reynolds Way (or the "Cathedral") housing development. The court credits this testimony.
            Turning to the BPD "Lineup Report" that corresponds with the photo array in this case, the last two digits of the booking numbers associated with the individuals depicted in the photo array identify the district where the arrest of each person occurred. See Ex. 4. Pinero's is the only booking number that ends in " 04 ," indicating that the other males shown in the photo array were arrested in different areas of Boston. Therefore, Lundbohm did not know or have reason to know that Ramsey might recognize the non-suspects depicted in the photographs prior to having another detective conduct the identification procedure. In these circumstances, the court concludes that police did not knowingly or intentionally seek to "s tack the deck against the defendant." German, 483 Mass. at 558.
            In arriving at this conclusion, the court rejects Pinero' s contention that Lundbohm should have investigated each non-suspect's background before including them in the photo array to determine whether Ramsey might possibly know them or, alternatively, that in every investigation (including the present), BPD must reach out to the State Police Fusion Center or other police departments outside Suffolk County to enlist their assistance in compiling a photo array. The court is not aware of any authority requiring suppression of an identification unless police analyze the background of each person depicted in a photo array to determine whether an eyewitness might possibly know that person or obtain fillers from outside a particular geographic jurisdiction or district.
 
                                                            -10-
 
            Commonwealth v. Walker, relied upon by Pinero, is distinguishable. In Walker, the SJC concluded, " an all-suspect array significantly and needlessly increases the potentially unjust consequences that may arise from a false positive identification. Unless there are exigent or extraordinary circumstances, the police should not show an eyewitness a photographic array, whether simultaneous or sequential, that contains fewer than five fillers for every suspect photograph." 460 Mass. 590,604 (2011). Here, Lundbohm showed Ramsey an array that consisted of one suspect and seven other individuals. Ramsey happened to recognize four of the non-suspects as belonging to a group who routinely caused problems for him and his family. There is always a risk that an eyewitness might recognize non-suspects in any given photo array. While recognizing four non-suspects in one photo array is an anomaly, it was not brought about through the intentional conduct of police. Application of the exclusionary rule in these circumstances would not deter police misconduct in the future. See Johnson, 473 Mass. at 598 ("[w]here an out-of-court eyewitness identification is suggestive through no fault of the police, suppression cannot deter police misconduct because there is none.").
            Still, there is no question Lundbohm inadvertently included photographs of four non- suspects who Ramsey recognize d. Consistent with Dr. I3ulevich's testimony, Ramsey could eliminate those four individuals from his possible set of choices. Consequently, the chance of Ramsey randomly selecting Pinero from the photo array increased.
            Although not argued by the defense, there are situations where an unnecessarily suggestive identification for which the police bear no responsibility may nevertheless be suppressed. "In [Commonwealth v. Jones], the Supreme Judicial Court recognized that common-law principles of fairness dictate that an unreliable identification arising from 'especially suggestive circumstances' should not be admitted in evidence even where the police
 
                                                            -11-
were not responsible for the suggestive confrontation." Commonwealth v. Jules, 464 Mass. 478, 489-490 (2013), quoting Commonwealth v. Jones, 423 Mass. 99, 108-109 (1996). "A motion to suppress an identification under Jones is similar to a motion to suppress an identification under art. 12 in that the defendant ... bears the burden of proof by a preponderance of the evidence." Commonwealth v. Johnson, 473 Mass. 594, 599(2016). "But a suppression ruling under Jones differs in two fundamental ways from the suppression ruling that a judge makes under art. 12 where the police are alleged to have obtained an eyewitness identification through an unnecessarily suggestive identification procedure. First, the standard of admissibility  is different; admissibility is determined not by a rule of per se exclusion, because there is no police misconduct to deter through suppression , but by weighing the probative value of the identification against the danger of unfair prejudice, and determining whether the latter substantially outweighs the former." Id. at 599-600.  Second, the standard of review differs.  Id. at 602.
            In the specific circumstances of this case, the court concludes that the probative value of Ramsey's identification of Pinero is not substantially outweighed by the danger of unfair prejudice to Pinero arising from the identification procedure. "Eyewitness identification of a person whom the witness had never seen before the crime or other incident presents a substantial risk of misidentification and increases the chance of a conviction of an innocent defendant." Jones, 423 Mass. at 109 (emphasis added). This is not such a case. Here, Ramsey immediately recognized Pinero as a person from the same housing development who, along with others, had been giving him and his family significant problems for close to two years. See Commonwealth
v. Kirkland, 491 Mass. 339, 353-354 (2023) (no likelihood trial judge would have suppressed witness's identification testimony given witness's emphasis of distinguishing physical traits of
 
                                                            -12-
 
shooter and past familiarity with defendant from neighborhood). In light of Ramsey' s prior familiarity with the defendant and given the police's otherwise adherence to Silva-Santiago and the double-blind, sequential procedure employed, suppression of the identification under common law principles of fairness is not required.
            Similarly, Ramsey's in-court identification of Pinero is admissible at trial. It is settled that an "in-court identification is comparable in its suggestiveness to a showup identification." Commonwealth v. Crayton, 470 Mass. 228, 236 (2014). Here, Ramsey was present during the shooting on July 4th He was also present at the housing complex approximately one week earlier when he claimed to have observed Pinero pointing a firearm at the window and door to his apartment. He had been having problems with Pinero and others for the better part of two years. Ramsey unequivocally identified Pinero from a photo array. "An in-court identification of the defendant by an eyewitness [who was] present during commission of the crime may be admissible if the eyewitness (I) participated before trial in an identification procedure and (ii) has made an unequivocal positive identification of the defendant." Mass. G. Evid. § 1112(c)(l)(A) (2022 ed.). See Commonwealth v. Collins, 470 Mass. 255, 259-267 (2014). In addition, there is "good reason" to allow Ramsey to identify Pinero in court because Ramsey "was familiar with the defendant before the commission of the crime." Crayton, 470 Mass. at 243. See Commonwealth v. Carr, 464 Mass. 855, 858, 874, 877 (2013) (in-court identifications not impermissibly suggestive where eyewitnesses had known defendant from neighborhood prior to murder).
 
                                                            -13-
 
ORDER
            For the reasons set forth above, the Defendant's Motion to Suppress Identification (Paper No. 35) therefore is DENIED.